RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 04a0392p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GERALD CASH et al.,

    *Plaintiffs-Appellants,*

v.

HAMILTON COUNTY DEPARTMENT OF ADULT PROBATION et al.,

    *Defendants-Appellees.*

No. 03-3916

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 01-00753—Sandra S. Beckwith, Chief District Judge.

Argued: September 24, 2004

Decided and Filed: November 12, 2004

Before: MERRITT, MOORE, and GILMAN, Circuit Judges.

---

### COUNSEL

**ARGUED:** Robert B. Newman, Cincinnati, Ohio, for Appellants. David Todd Stevenson, HAMILTON COUNTY PROSECUTOR'S OFFICE, Cincinnati, Ohio, Richard Ganulin, CITY SOLICITOR'S OFFICE FOR THE CITY OF CINCINNATI, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Robert B. Newman, Stephen R. Felson, Cincinnati, Ohio, for Appellants. David Todd Stevenson, Susan M. Gertz, HAMILTON COUNTY PROSECUTOR'S OFFICE, Cincinnati, Ohio, Richard Ganulin, CITY SOLICITOR'S OFFICE FOR THE CITY OF CINCINNATI, Cincinnati, Ohio, for Appellees.

---

### OPINION

    RONALD LEE GILMAN, Circuit Judge. Homeless individuals in Cincinnati, Ohio brought suit pursuant to 42 U.S.C. § 1983 against the city and county, alleging that these entities had violated the plaintiffs' Fifth and Fourteenth Amendment rights to the due process of law by destroying their personal property without notice and without any right to reclaim the items taken. The district court granted summary judgment in favor of the defendants. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

# I. BACKGROUND

## A. Factual background

The City of Cincinnati pays Hamilton County to provide city cleanup services. Crews of individuals sentenced to community service and assigned to the Hamilton County Department of Adult Probation's Community Service Program, led by a field supervisor, provide litter collections and ground maintenance of city-owned lots. At issue in this case are the cleanup activities of these crews in areas where homeless individuals reside.

In October of 2001, Gerald Cash, a homeless man, was living under the Fifth Street Viaduct in Cincinnati with his wife, Clara Cash, and his friend, Rocky Wayne Adkisson. One day in mid-October of 2001, the Cashes returned to their living space and found a group of people from the Community Service Program taking away their property. When Gerald Cash asked for his property to be returned, the work crew supervisor allegedly told him: "I'm not allowed to; we have been given orders to clear out under all the bridges."

The Cashes and Adkisson made efforts to locate their property, but were unsuccessful. Clara Cash stated in an affidavit that she called the City of Cincinnati's Sanitation Division and, although she was told that her property would be held for 30 days, she was not told where it was located. Molly Lyons, an organizer with the Greater Cincinnati Coalition for the Homeless, also tried to locate the property that was taken from under the Fifth Street Viaduct. Lyons said that she called the Sheriff's Office and was told that "the stuff from the homeless sites is thrown away."

## B. Procedural background

Five homeless individuals—Gerald Cash, Clara Cash, Rocky Wayne Adkisson, Phillip Garcia, and Gregory B. Wahoff—filed suit against the Hamilton County Department of Adult Probation, the Chief Probation Officer for the Department, and the City of Cincinnati (hereafter referred to collectively as the City and County) in October of 2001. Three of the five plaintiffs have since died. The remaining two (hereinafter the plaintiffs) continue with this suit.

The plaintiffs sought actual damages and injunctive relief, claiming that the City and County violated their Fifth and Fourteenth Amendment rights by destroying their property without affording them the due process of law. They also sought a preliminary injunction requiring the City and County to cease and desist from their alleged practice of seizing and confiscating the property of homeless citizens without notice and a hearing. Subsequently, however, the plaintiffs explicitly stated that they no longer contest the City's authority to remove personal property from municipally-owned areas. They acknowledge in their brief that "[i]t is the *destruction* of property without notice and a hearing which is at the heart of Plaintiff's case." (Emphasis in original.)

In May of 2002, the City and County moved for summary judgment. The district court, a little over a year later, granted these motions and denied the plaintiffs' motion for a preliminary injunction. This appeal followed.

# II. ANALYSIS

## A. Standard of review

We review a district court's grant of summary judgment de novo. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in

favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.    The alleged constitutional violations of the City and County**

The plaintiffs brought suit against the City and County under 42 U.S.C. § 1983, which provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

"Section 1983 does not itself create any constitutional rights; it creates a right of action for the vindication of constitutional guarantees found elsewhere." *Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir. 1990). The plaintiffs allege that the City and County violated their Fifth and Fourteenth Amendment rights to the due process of law by destroying their personal property without notice and without the right to reclaim the items taken.

This court engages in a two-pronged inquiry when considering a municipal-liability claim. *Doe v. Claiborne County*, 103 F.3d 495, 505 (6th Cir. 1996). First, the court must determine whether the plaintiffs have asserted the deprivation of a constitutional right. *Id.* at 505-06. If so, the court must then decide whether the City and County are responsible for that deprivation. *Id.* at 507.

The threshold question is "whether the interest at stake is within the Fourteenth Amendment's protection of liberty and property." *See Arnett v. Myers*, 281 F.3d 552, 564 (6th Cir. 2002) (discussing whether hunters had a constitutionally-protected interest in their duck blinds). There can be little doubt that the plaintiffs have a protected property interest in their own items of value. *See Harris v. City of Akron*, 20 F.3d 1396, 1401 (6th Cir. 1994) ("Generally, the process that is due before the state may deprive an owner of property includes notice to the owner prior to the deprivation and an opportunity for a predeprivation hearing.").

We must next decide if a genuine issue of material fact exists as to whether the City and County are responsible for the alleged due process violation. Because *respondeat superior* liability is not available as a means of recovery under § 1983, *Doe*, 103 F.3d at 507, the plaintiffs cannot base their claims against the City and County solely on the conduct of the workers who effected the sweep of homeless areas. *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978) (holding "that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents"). The plaintiffs must demonstrate that the City and County are themselves the wrongdoers. *Id.*

Municipalities and other bodies of local government may be sued pursuant to 42 U.S.C. § 1983 if they are "alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (citing *Monell*, 436 U.S. at 690). Section 1983 also "authorizes suit 'for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.'" *Id.* (citing *Monell*, 436 U.S. at 690-91). Although a § 1983 plaintiff might not be able to demonstrate that a written policy exists, he or she "may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691. (citation and quotation marks omitted).

This court has explained that a "custom" for the purposes of § 1983 liability

> must be so permanent and well settled as to constitute a custom or usage with the force of law. In turn, the notion of 'law' must include deeply embedded traditional ways of carrying out state policy. It must reflect a course of action deliberately chosen from among various alternatives. In short, a 'custom' is a 'legal institution' not memorialized by written law.

*Doe*, 103 F.3d at 507-08 (citations and quotation marks omitted). Not only must the plaintiffs show that the City and County as entities caused the constitutional violation, but they "must also show a direct causal link between the custom and the constitutional deprivation." *Id.* at 508. "This requirement is necessary to avoid de facto *respondeat superior* liability explicitly prohibited by *Monell*." *Id.*

The district court relied exclusively on "the undisputed testimony from the supervising police officers [who stated] that the probationers are instructed to separate personal belongings from trash. Personal belongings are then inventoried in the police property room where they are held, according to one police officer, for one year before they are thrown away." From this "undisputed evidence," the district court reasoned that any destruction of the plaintiffs' property that occurred at the homeless site "would be unauthorized because the probationers are instructed to separate personal belongings from trash."

The district court based its holding on the United States Supreme Court's decisions in *Parratt v. Taylor*, 451 U.S. 527 (1981), and *Hudson v. Palmer*, 468 U.S. 517 (1984), which stand for the proposition that unauthorized deprivations of property by the state are not violations of due process so long as postdeprivation remedies are available. Concluding that any destruction of the plaintiffs' property would have been unauthorized, given the purported practice of preserving items of value, the court held that no due process violation occurred. The plaintiffs, in other words, were free to sue the City and County after-the-fact either for replevin (to get their property back) or for money damages.

Contrary to the declaration of the district court that the supervising police officers' testimony was "undisputed," the plaintiffs presented substantial evidence suggesting that the City and County had a custom and practice of hauling to the dump all unattended property found at the sites in question. Jeffrey Smith, Field Supervisor for the Hamilton County Adult Probation Department, testified that he had been accompanying adult probationers sentenced to community service on cleanup jobs for ten years. Smith explained that he and his work crews "just follow the Cincinnati Police, and they direct us where to go, and they direct the probationers what to clear and how to do it."

In fact, Smith stated that he is not even present in the immediate area where the cleanup takes place. "I never go up [to] an area," Smith asserted, "I just stay down below and let the officer direct accordingly." Smith testified that the standard cleanup procedure was that a Cincinnati police officer would direct the probationers to put all of the items in bags and then place the bags into a sanitation truck. In direct opposition to the testimony that the district court relied upon, Smith testified that he *never* observed a Cincinnati police officer segregating any of the items and saying that some should be saved. Smith stated that the items are all "hauled off to the trash, to the dump."

Testimony from Cincinnati Police Officer Thomas J. Branigan also supports the plaintiffs' contention that the City had a custom of destroying homeless individuals' property without notice or the right to reclaim the items taken. Branigan testified that he was present for three days of cleanup in mid-October of 2001. The cleanup process, according to Branigan, is swift and indiscriminate. He explained that the probationers "don't rake the property down to get it to a fine clean. They don't use shovels; whatever they put in their hands, put in the bag, and pass it down." Branigan distinguished this procedure in dealing with the homeless from the Police Department's general policy for dealing with personal property found at other locations around the city. In Fountain Square, for example, any unattended property is taken back to the police station,

logged, and held as found property. If someone can prove that the property is theirs within "the proper amount of time," the property is returned to that person.

Testimony contrary to that of Smith and Branigan was presented by the City and County. For the purpose of summary judgment, however, all of the evidence must be construed in favor of the plaintiffs as the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In short, a genuine issue of material fact exists as to whether the property of homeless persons like the plaintiffs was being discarded as part of the City's official policy. The district court therefore erred in granting summary judgment to the City and County on the basis that the relevant testimony was uncontested.

A genuine issue of material fact also exists over whether adequate notice was provided to homeless individuals like the plaintiffs. The established precedent is that individuals whose property interests are at stake are entitled to a "notice and opportunity to be heard." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993). The key inquiry in such circumstances is whether the notice is "reasonably calculated, in all the circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1953). The City submits that it published a notice in the local newspaper, which was available for anyone in the Cincinnati area to pick up and read. By contrast, the plaintiffs contend that such a notice is per se insufficient, particularly when the educational and financial restraints of the homeless community are considered. This is an issue for the district court to resolve on remand.

## C.    Ripeness

As part of its defense, City argues that the plaintiffs' Fifth Amendment takings claim is not ripe because the plaintiffs did not pursue adequate state procedures for seeking compensation for the alleged taking. The City contends, therefore, that this claim must be dismissed for lack of subject matter jurisdiction. The plaintiffs, however, have abandoned their Fifth Amendment takings claim and are relying solely on the Fourteenth Amendment as the legal basis for their lawsuit. We therefore have no need to address the ripeness issue.

## D.    Hamilton County's Eleventh Amendment immunity argument

The County argues that it is entitled to Eleventh Amendment immunity from suit because the Hamilton County Department of Adult Probation is an arm of the common pleas and municipal courts of the state of Ohio. To support this contention, the County cites a number of Ohio statutes. *See* O.R.C. § 2301.27(A)(1) ("The court of common pleas may establish a county department of probation."); § 1901.33(A) ("The judge or judges of a municipal court may appoint one or more . . . probation officers. . . . Probation officers have all the powers of regular police officers and shall perform any duties that are designated by the judge or judges of the court."); § 1901.33(B) ("If a municipal court appoints one or more probation officers, those officers shall constitute the municipal court department of probation unless the court designates other employees as the department of probation for the court.").

The bald assertion that the Department is an arm of the common pleas and municipal courts is insufficient by itself to garner Eleventh Amendment immunity. *See Alkire v. Irving*, 330 F.3d 802, 811 (6th Cir. 2003) (rejecting a per se rule granting Eleventh Amendment immunity to county courts). Rather, this argument is one of many factors that must be considered by the district court. We have recognized that the most important factor is "will a State pay if the defendant loses?" *Brotherton v. Cleveland*, 173 F.3d 552, 560 (6th Cir. 1999). In *Brotherton*, this court considered whether a county coroner enjoyed Eleventh Amendment immunity. We concluded that "because Hamilton County—rather than the State of Ohio—would satisfy any money judgment against its county coroner, the case does not implicate the Eleventh Amendment." *Id.* at 563; *see also S.J. v. Hamilton County*, 374 F.3d 416, 420-21 (6th Cir. 2004) (rejecting sovereign immunity for a juvenile training facility and noting that the "emphasis on 'who pays' is substantial"); *Alkire*, 330 F.3d at 811 ("[W]e now recognize that the question of who pays a damage

judgment against an entity as the most important factor in arm-of-the-state analysis, though it is unclear whether it is the only factor or merely the principal one.").

The County raised the issue of Eleventh Amendment immunity in its motion for summary judgment. Although the district court granted the County's motion, the order provides no findings or analysis pertaining to the Eleventh Amendment. A final resolution of this issue will turn on factual findings regarding whether the Department of Adult Probation is part of the Ohio court system and whether the State or the County would pay damages for a constitutional violation perpetrated by the Department. We therefore remand this issue to the district court for further development.

### III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.