IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| GERALD CASH, et al., | : | Case No. 1:01cv753 |
| Plaintiffs, | : | (J. Beckwith; Mag. J. Sherman) |
| v. | : | <u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT CITY OF CINCINNATI</u> |
| HAMILTON COUNTY DEPARTMENT OF PROBATION, et al., | : | |
| | : | (Liability Only) |
| Defendants. | | |

  Now come Plaintiffs in the above-styled action, by their undersigned counsel, and respectfully request this Court to grant them summary judgment against Defendant City of Cincinnati on the issue of liability only.  The reasons why this motion should be granted are set forth in the accompanying memorandum.

              Respectfully submitted,

              <u>/s/ *Stephen R. Felson*</u>
              Robert B. Newman (0023484)
              Lisa T. Meeks (0062074)
              NEWMAN & MEEKS CO., LPA
              617 Vine Street, Suite 1401
              Cincinnati, Ohio 45202
              (513) 639-7000

              Stephen R. Felson  (0038432)
              617 Vine Street, Suite 1401
              Cincinnati, Ohio  45202
              (513) 721-4900
              (513) 639-7011
              SteveF8953@aol.com

**MEMORANDUM**

A.  INTRODUCTION

The Sixth Circuit opinion (reported at 388 F.3d 539) remanded this case for a decision on two separate matters relating to the City:

    1.  "Whether the property of homeless persons like the plaintiffs was being discarded as part of the City's official policy." (*Id*. at 544)

    2.  "Whether adequate notice was provided to homeless individuals like the plaintiffs." (*Id*.)

As Plaintiffs will demonstrate below, the record contains sufficient uncontested evidence on each of these points to compel summary judgment in their favor.

B  THE OVERWHELMING RECORD TESTIMONY DEMONSTRATES THAT IT IS THE OFFICIAL POLICY OF THE CITY OF CINCINNATI TO DISCARD THE PROPERTY OF HOMELESS PERSONS WITHOUT NOTICE OR A HEARING.[1]

    1.  The Testimony Concerning Homeless Sweeps Overwhelmingly Supports Plaintiffs' Position

Jeffrey Smith, Field Supervisor for the Hamilton County Adult Probation Department during the relevant period, testified that he had been accompanying adult probationers on cleanup sweeps for ten years. (Smith Depo., filed 5/23/02 at 20; Apx. at 368). He further testified:

> Q [by Plaintiffs' attorney]:  And incidentally, when you go to city sites to clear anything that's been left by hobos or homeless people *it's the city people who designate the sites that need to be cleared*; is that correct?
>
> A:  We just follow the Cincinnati Police and they direct us where to go, and *they direct the probationers what to clear and how to do it*.
>
> Q:  All right. So this would have been Mr. Branigan in October directing the probationers where to go and what to clear?
>
> A:  Yes, sir.

---

[1] Since Plaintiffs did not move for summary judgment earlier, the question of whether the City's evidence could *defeat* summary judgment was not before the Court of Appeals.

>   Q:   Okay. So, in other words, it was Mr. Branigan who, Officer Branigan who was in charge at that site, at that clearance?
>
>   A:   Correct.

(*Id*. at 6-7; emphasis added)

The County Field Supervisor testified further that he never went up into an area being cleaned: "I just stay down below and let the [police] officers direct accordingly." Thus, at the direction of the City police officer, the adult probationers "bag it [what they find] up and toss it in the trucks." (*Id*. at 7-8) Mr. Smith stated categorically that no property was "segregated out to be stored or kept elsewhere," but rather that "everything was put in the bag and put on the trucks." (*Id*.)

Mr. Smith had attended many cleanup jobs "under bridges where people have been apparently sleeping and staying" over the years. (*Id*. at 9) He stated that he would take his crews "wherever the Cincinnati Police takes us to, directs us to go." (*Id*.) Mr. Smith reiterated that the policy, carried out during the many times he had participated in these cleanup operations, was that "the Cincinnati police officers will direct the probationers when to start working, what to do." The standard procedure was to "put all the stuff in bags" and then "put them into a truck." (*Id*. at 11) Mr. Smith testified that *he had "never observed a Cincinnati police officer segregating any of this material and saying that anything should be saved*." (*Id*.; emphasis added.) Put another way, "the probationers themselves don't have any decision-making power on what to save, what not to save." (*Id*. at 12) All property picked up at any of these sites is "*hauled off to the trash, to the dump*." (*Id*. at 14; emphasis added.)

3

Cincinnati Police Officer Thomas J. Branigan testified that he was present for three days of cleanup in mid-October, 2001, under the Sixth Street bridge. (Branigan Depo., filed 5/23/02, at 6) He remembered that Probation Officer Jeffrey Smith had called him to see if he [Branigan] could assist the Hamilton County Probation Department by protecting the vehicle to be used in the cleanup. (*Id*. at 8). He remembered a "County truck" belonging to Hamilton County Adult Probation being present. However, he also remembered that he remained on the site for hours "because we had to wait for the City truck" to take away the bags. (*Id*. at 9-10)

Officer Branigan made it quite clear what the prevailing cleanup policy was concerning personal property found at homeless sites:

> These prisoners [*i.e.*, the probationers] don't rake the property down to get it to a fine clean. They don't use shovels; whatever they put in their hands, put in the bag, and pass it down.

(*Id*. at 19)

Cincinnati Police Officer Thomas Prem described complaints of trash being left by homeless people in what he called "homeless camps." (Prem Depo., filed 5/23/02, at 5) He testified that "we came up with a plan to go to these locations, clean up the mess and advise these people where the proper shelters were because a lot of the property was state, federal and city property." (*Id*. at 6) The plan was created among the "city sanitation department, the police division and adult probation." The plan was not his, but came from his supervisors, who met with him and with sanitation and adult probation personnel. (*Id*. at 7) His supervisors included a "Captain, Lieutenant, Sergeant." (*Id*. at 8) "Higher-ups in the police department . . . were getting the complaints and pushing them down to the guy walking the beat," namely Officer Prem. (*Id*.) He described

4

cleanup operations where the City sanitation department would arrive with "compactor trucks and dump trucks." (*Id*.) The policy was in use at a multitude of sites that Officer Prem described, not just under bridges near the Interstate. (*Id*. at 10-12)

Finally, the City's own description of what occurred at the homeless sites is instructive, and virtually concedes the existence of a policy of destroying personal items without notice and a hearing.

> When Officer Branigan and the crews came to the area for clean-up, the occupants or trespassers were given time to remove any items they wished to keep. The remaining property – having no value – was picked up, bagged, and placed in a sanitation truck. *Any items left by the trespassers constituted abandoned property*.

(Doc. 24, City Memo at 7; emphasis added.)

There is no requirement in the law that the Chief of Police or any other high official or body expressly adopt the property-destruction policy described above. "If . . . a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose." *Praprotnik*, *supra*, 485 U.S. at 126; *accord*, *Chew v. Gates*, 27 F.3d 1432, 1445 (9th Cir. 1994) ("if the city in fact permitted departmental policy regarding the use of canine force to be designed and implemented at lower levels of the department, a jury could, and should, nevertheless find that the policy constituted an established municipal 'custom or usage' regarding the use of police dogs for which the city is responsible.")

In summary, the express, eyewitness testimony concerning ten years of cleanup at homeless sites compels a single conclusion: that the City of Cincinnati had a

longstanding policy of discarding the property of homeless persons. There is no need for submission of this point to the trier of fact.[2]

    2. <u>The City's Policy Concerning Found Property in Other Areas of the City is Immaterial to this Case</u>.

The Sixth Circuit opinion distinguished the policy of the Cincinnati Police Department

> in dealing with the homeless from the Police Department's general policy for dealing with personal property found at other locations around the city. In Fountain Square, for example, any unattended property is taken back to the police station, logged, and held as found property. If someone can prove that the property is theirs within "the proper amount of time," the property is returned to that person.

388 F.3d at 544. Thus, Officer Branigan stated that his personal policy was to take found property such as a "cell phone, a watch, a pair of boots," back to the station. (Branigan Depo., filed 5/23/02, at 35-36) Officer Prem followed the same policy. (Prem Depo., filed 5/23/02, at 12-13)

Again, while Plaintiffs have no doubt that individual officers who find this type of personal property in the park or on the street make sure it is held for a reasonable time in order that the owner may come to the station and identify it, the overwhelming evidence concerning homeless sites is that the adult probationers come with the trucks and compactors, "bag it [what they find] up and toss it in the trucks," as Jeffrey Smith, the

---

[2] The only arguable evidence contra came from Officer Prem, who believed community service probationers *were* instructed to give the supervising police officers "anything of value . . . and we'd take care of that." (*Id*. at 39) Compared to the overwhelming evidence set forth above, this "mere scintilla" of evidence should not be permitted to prevent summary judgment on this point in favor of Plaintiffs, *see Gaddis ex rel. Gaddis v. Redford Tp.*, 364 F.3d 763, 773-74 (6th Cir. 2004), especially where the officer testified in a general way, without specific examples, unlike the other witnesses.

field supervisor for the County, testified. This is a sufficient basis upon which to grant Plaintiffs' motion.

C. THERE IS NO MEANINGFUL DISPUTE UNDER RULE 56 CONCERNING THE DESTRUCTION OF PLAINTIFFS' PROPERTY WITHOUT NOTICE. EVEN IF A DISPUTE EXISTS AS TO WHETHER PLAINTIFFS' PROPERTY WAS DESTROYED OR IMPOUNDED, NO NOTICE WAS GIVEN IN EITHER CASE.

Neither this Court nor the Court of Appeals held that there was a factual issue as to whether Plaintiffs had their property taken in the first place. Plaintiffs' sworn declarations, filed on July 1, 2002, describe the property in detail, and also describe the attempts of the County probationers to take it, attempts which were finally successful. The City supplied no evidence to the contrary; it cannot, therefore, ask the Court to draw any inferences in its favor. *See Albeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 248 (6th Cir. 1998) (non-moving party failed to present "enough evidence to permit an inference of discrimination").[3] Plaintiffs therefore take it as established for purposes of this motion that the City took possession of their property.

This splits the Court of Appeals' remand concerning the notice issue into two elements. If the property was bagged on the homeless site and sent off to the dump, as the overwhelming weight of the evidence indicates, there is no way the City can argue that it gave *pre-destruction* notice, as required by all the authorities including the Sixth Circuit in this case. *See* 338 F.3d at 542 ("Generally, the process that is due before the state may deprive an owner of property includes notice to the owner prior to the deprivation and an opportunity for a predeprivation hearing.") If, however, the City

---

[3] For example, if the City had presented testimony that other persons with bags and trucks were seen in the area at the relevant time, the Court could infer that those persons rather than the adult probationers had taken Plaintiffs' property. Such an inference might be sufficient to deny Plaintiffs' summary judgment motion on the ground that a material fact was still in dispute. No such testimony has emerged, however.

*preserved* some or all of the personal property, the notice issue becomes arguable. Plaintiffs will deal with both situations in this Section.

    1. <u>Plaintiffs Have Presented Uncontradicted Evidence that Their Property Was Destroyed at or Shortly After the City Took Possession of It</u>.

The testimony set forth in Part A, *supra*, applies here also. As there noted, Jeffrey Smith, the County Field Supervisor, stated that during the ten years he was in charge of cleaning up homeless sites he *never* saw anyone segregate personal property to preserve it from destruction until notice could be given. Plaintiffs will not repeat the argument.

    2. <u>Regardless of When Defendants Destroyed Plaintiffs' Property, Adequate Notice was Lacking as a Matter of Law</u>.

The Court of Appeals accepted, for purposes of the appeal, that the City "published a notice in the local newspaper, which was available for anyone in the Cincinnati area to pick up and read." *Id*. at 544. While this may be the City's general practice for found property, it has presented no evidence that it ever did so with regard to property found in homeless sweeps or that it did so with regard to Plaintiffs' property. As the appellate court expressly noted, the practice for property found at Fountain Square is immaterial here if not applied to homeless property. *Id.*

In contrast with the City's failure to offer any evidence of notice concerning the whereabouts of Plaintiffs' property, whether by publication or otherwise, Plaintiffs presented an abundance of evidence that they attempted to find this fact out for themselves but were wholly unsuccessful. Clara Cash called the sanitation division but could find out nothing. (Declaration, ¶ 8) The same is true for Mr. Adkisson. (Adkisson Declaration, ¶ 8) Molly Lyons, an organizer with the Greater Cincinnati Coalition for the Homeless, also "made efforts to try to locate the property of the homeless people that was

8

Case 1:01-cv-00753-SSB-JS    Document 46    Filed 10/11/2005    Page 9 of 11

MSJ (Pltfs)
10/11/2005, Page 9

taken." (Lyons Declaration, ¶ 4) She called Cincinnati Public Services, who said that "solid waste would be there with the police." (*Id.*, ¶ 5) The Sheriff's office told her that anything found on homeless sites is thrown away. (*Id.* ¶ 6) She spoke to an Officer Fox of the Cincinnati Police Division ("CPD") about whether anything had been received from under the bridges; he said that it had not. An Officer Bryant of the CPD disclaimed any responsibility for sweeps of property of homeless people. (*Id.*, ¶¶ 7-8) No one told Ms. Lyons where or when any hearing might take place.

This evidence is not only highly probative of prior destruction at the time of the sweep, it also belies any claim of pre-destruction notice by the City in the unlikely event that any of Plaintiffs' property survived the sweep. In other words, if the City really published notice concerning property found in homeless sweeps, someone had to know about it and a more-than-reasonable inquiry such as the one made by Ms. Lyons should have uncovered at least the *fact* of publication notice. The notice itself, of course, would be in the custody and control of the City. The City's failure to offer it during discovery – <u>when such a notice mentioning a Bible, boots, a family portrait, electric blankets, reading glasses, etc., would go far in proving the City's case</u>[4] – is a strong indication that such notice does not exist.

CPD Officer Boertlein had been in charge of the property room at District One for three and one-half years at the time of his deposition. (Boertlein Depo., filed 5/23/02, p. 4) He provided Plaintiffs' counsel with a printed inventory of all property received by his unit in the month of October, 2001. (R. 26, Newman Affid., ¶¶ 2-4 and attachment) None of Plaintiffs' property appears in this inventory. (*Id.* ¶ 5)

---

[4] Plaintiffs would still have argued that reasonable notice to the homeless should have included a sign at the site itself.

Finally, Plaintiffs' discovery uncovered no evidence whatever of any hearing or any notice of hearing to any Plaintiff, or in fact to anyone at all, whether by publication, mail, or otherwise, and whether before or after the seizure and destruction of the personal property from under the bridges.  None of the Defendants offered an affidavit or other testimony indicating that notice and a hearing were provided with respect to the property of homeless persons in general or the property taken in these sweeps in particular.  In these circumstances there is nothing left to try with respect to this issue.

## CONCLUSION

These are the only issues set forth in the Sixth Circuit opinion which relate to the City.  They can both be decided as a matter of law on the record before the Court.  Plaintiffs' Motion for Partial Summary Judgment against the City should be granted.

Respectfully submitted,

/s/ *Stephen R. Felson*
Stephen R. Felson (0038432)
617 Vine Street, Suite 1401
Cincinnati, Ohio  45202
(513) 721-4900
(513) 639-7011 (fax)
SteveF8953@aol.com

Robert B. Newman (0023484)
Lisa T. Meeks (0062074)
NEWMAN & MEEKS CO., LPA
617 Vine Street, Suite 1401
Cincinnati, Ohio  45202
(513) 639-7000
(513) 639-7011 (fax)

## CERTIFICATE OF SERVICE

      I hereby certify that on October 11, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: upon **David T. Stevenson**, 230 E. Ninth St., Suite 4000, Cincinnati, Ohio, 45202, and upon **Julia L. McNeil** and **Richard Ganulin**, 801 Plum Street, Room 214, Cincinnati, Ohio, 45202.

                                        /s/ *Stephen R. Felson*