UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| GERALD CASH, et al. | : | CASE NO. 1:01CV753 |
| Plaintiffs | : | (Judge Beckwith) |
| v. | : | CITY OF CINCINNATI'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT |
| HAMILTON COUNTY DEPARTMENT OF ADULT PROBATION, et al. | : | |
| | : | |
| Defendants. | : | |

**I.  INTRODUCTION**

The City of Cincinnati moves for summary judgment. The record includes the recent depositions of the plaintiffs and others, and exhibits and affidavits previously submitted. The law includes relevant recent decisions of the Supreme Court of the United States and the United States Court of Appeals for the Sixth Circuit.

The plaintiffs' claim is that 1) during the few days in 2001 that one Cincinnati police officer was asked to participate in the cleanup of unsanitary, dangerous, and unlawful encampments, items of value to the plaintiffs were thrown away, and 2) the disposal was proximately caused by an alleged unconstitutional custom of the City of Cincinnati to dispose of "lost and found" property without providing due process of law. One plaintiff did not even leave any items at the sites involving the Cincinnati police officer. The other plaintiff cannot prove either that a Cincinnati police officer was involved or that items of value to him were disposed as the proximate cause of an unconstitutional custom of the City of Cincinnati.

The only remaining active plaintiffs are Garcia and Wahoff.[1] The United States Court of Appeals for the Sixth Circuit emphasized that the surviving claim is whether the City had an unconstitutional custom of destroying trespassing individuals' "lost and found" property left unattended on public property. *Cash, et al. v. Hamilton County Department of Adult Probation, et al.*, 388 F.3d 539, 544 (2005). There are no genuine issues of material fact, the City did not have an unconstitutional custom that proximately caused the alleged destruction of Garcia's and Wahoff's property, and the City is entitled to judgment as a matter of law.

## II. FACTS

The uncontroverted facts elicited in detail below establish that in 2001 one low level City employee properly fulfilled his employment responsibilities by helping to abate unsanitary, unhealthy, and dangerous conditions on public property. The uncontroverted evidence is that the City employee exercised all due caution to preserve items of value during the cleanup and that the policy and practice of City employees in prior years when asked to help in similar abatements was to preserve items of value. Hamilton County individuals participating in cleanup activities also confirmed that special efforts were made to preserve items of value.

Plaintiff Wahoff alleged that his property was taken from the area of the "Fifth Street viaduct west of Central Avenue in Cincinnati, Ohio." Amended Complaint, paragraph 6. He testified that in October 2001 he had been encamped on public property under the Fifth Street Viaduct. Wahoff Deposition, p. 6. On October 15, 2001, he was encamped under the Sixth Street Bridge. *Id.*, p. 19. He knew that his encampment constituted criminal trespass. *Id.*, p. 18. Wahoff testified that when individuals arrived to clean that site, he "got the hell of there . .

---

[1] A suggestion of death was filed in the United States Court of Appeals regarding the Cash plaintiffs and there was no timely substitution. Plaintiff Adkisson was not made available for deposition. Plaintiff Garcia was the only plaintiff to file a motion for leave to proceed *in forma pauperis* in response to the City's Petition for Writ of Certiorari to the United States Supreme Court.

.[b]ecause I didn't want to go to jail." *Id.*, p. 21. He testified that "there was trash from people who camped there before because they - they wouldn't bag up their trash. You would see cans, bottles all over the place . . . you could look up on the hillside and see all the trash in the rocks, the hillside of rocks. You could see their trash. It was broken glass, everything." *Id.*, p. 24. He never complained to the City of Cincinnati about property being taken from encampments prior to filing the complaint in the case at bar. *Id.*, p. 25. He never went to the Police Department Property Room to attempt to retrieve his belongings. *Id.*, p. 32.

Concerning the Fifth Street Viaduct, Wahoff observed individuals on a work detail from the Queensgate Center[2] "throwing the garbage straight in the truck . . . bringing our belongings and going straight in the garbage truck." *Id.*, pp. 9-10, 12. He testified that a sergeant at the Queensgate Center was in charge of the individuals cleaning the site. *Id.*, p. 10. Wahoff did not know which government entity decided to clean the encampment on public property. *Id.*, pp. 16-17. He did testify that the individuals in the work detail were controlled by the Hamilton County Sheriff's Department. *Id.*, p. 41. Wahoff's testimony also related to an incident that was not part of his claim in this case. *Id*., p. 37.

Wahoff read newspapers. *Id.*, p. 16. He testified, "I try to go up to the public library and get newspapers . . . you know, I love reading the newspapers." *Id.* He tries to read the newspapers each day. *Id.* Wahoff had actual knowledge that the City published notices in the newspaper about auctions of unclaimed property. *Id.*, p. 22.

Plaintiff Garcia alleged and testified that on September 28, 2001, some probationers or some unknown individuals took objects belonging to him from an unlawful encampment. Garcia Deposition, pp. 8-9. Garcia testified that City sanitation workers previously provided him trash bags to help him clean his encampments. *Id.*, p. 6. That was the only information he had about

---

[2] The Queensgate Center is a correctional facility operated by Hamilton County.

3

any alleged City policy or practice. *Id.*, p. 7. He knew that camping under bridges constituted trespassing. *Id.* He did not know who removed his property from his encampment on September 28, 2001, but he assumed it was Community Service Participants working for Hamilton County. *Id.*, pp. 9, 15. On that date, however, Wahoff observed Plaintiff Garcia's dog taken by the Society for the Prevention of Cruelty to Animals. Wahoff Deposition, p. 14. Garcia did not check to find his property or go to the Police Department Property Room. Garcia Deposition, pp. 10, 17. He never complained to City of Cincinnati officials about City employees taking his property. *Id.*, pp. 13-14. Garcia admitted that encampments can have a lot of trash and can be unhealthy. *Id.*, p. 16. He did not object to the cleanup of dirty and unsanitary camps. *Id.*, p. 17. Garcia also reads newspapers. Garcia Deposition, p. 10. He knew that newspapers had legal notices for sales of property. *Id.*

Cincinnati Police Officer Prem described how in the 1990s, as part of his responsibilities as a police officer, he originated the coordinated response to citizen complaints about the dirty and unsanitary conditions at homeless encampments. Prem Deposition, pp. 6, 7. The majority of complaints came from citizens. *Id.*, pp. 59-60. His supervisors up to his captain were aware of Prem's efforts. *Id.*, pp. 7-8.[3] It was not a written plan. *Id.*, p. 40. It was developed by City employees to coordinate a response to the crime, litter, etc., at encampments. *Id.*, pp. 40-41. Officer Prem was in charge of the cleanup activities. *Id.*, pp. 48-49. Officer Prem retired in January 2001, prior to the incident in issue in the case at bar. *Id.*, pp. 4-5.

Officer Prem found some dead individuals at homeless camps. Prem Deposition, p. 5. He testified: "Very gruesome scene. Rats were eating on him when we found him." *Id.* He added that there were unusual numbers of crimes at the homeless camps. *Id.*, p. 6. There was

---

[3] In 2001, the chain of command in the City went from Captain to Assistant Chief of Police to Chief of Police to Safety Director to City Manager. Under the City Charter, the City Manager is the chief executive of the City and City Council is the legislative policymaking authority.

4

excessive alcohol consumption. *Id.* One location had garbage four feet high. *Id.*, p. 10. Rats jumped out of the trash. *Id.* Trash "just kept building up." *Id.*, p. 11. There was human waste at the homeless camps. *Id.* He testified: "The human waste, the amount of garbage and refuse that attracted rodents and everything else. I mean it was something else." *Id.*, p. 12. There were even fires. *Id.*, p. 44.

Officer Prem testified that there were complaints about the homeless camps and he coordinated a response to address the crime, deaths, exposure of homeless individuals to the elements, unsanitary conditions, litter, etc. *Id.*, pp. 6-7. As he explained it: "We had to address the problem - all the problems that grew out of this problem. And yeah, we tried to stay on top of it to eliminate the crime problem, the victim of crime problem, the horrible living conditions . . . . I'll tell you, I do not like finding people dead with rats eating them up." *Id.*, p. 31.

Officer Prem emphasized that if any personal property was located "that was tagged and sent to the property room." *Id.*, p. 12. He added: "[A]nytime you would find personal papers, medication, things that were of value and that, were personal property, we would try to take that and tag that." *Id.*, pp. 12-13. "So anything of value would be taken out and sent to the police property room." *Id.*, p. 13. On the one occasion that an individual came to City Hall seeking property, he was referred to the Property Room and he retrieved his property. *Id.*, p. 21. Officer Prem used the County provided labor pool. *Id.*, p. 9. The Community Service Probationers did the labor at the sites. *Id.*, p. 39. The Probationers were instructed to give anything of value to Officer Prem. *Id.*, pp. 39, 46. He testified: "[W]e tried to do everything diligently to make sure personal items were separated from the refuse." *Id.*, p. 39. Office Prem admitted: "[W]e didn't go through every bag and everything. I mean, when you got rats jumping out of these piles . . . you see rats jump out of a bag, you're a little hesitant to pick up a bag . . . . I mean, when you see

5

rats jumping around, when you see them and they don't have many places to go, they just jump around. I mean it's - hair stands up on the back of your neck." *Id.*, pp. 41-42.

  The procedure for items of value is that they were tagged, information was provided, they were delivered to the Property Room, and logged into the property book. *Id.*, pp. 21-24. Sergeant Boertlein, in charge of the Property Room, testified that "lost and found" property would be tagged, the date and location identified, and it would be delivered to the Property Room. Boertlein Deposition, pp. 4-5. Forms are used to create files identifying the "lost and found" property. *Id.*, pp. 5-6. A typical day has hundreds of copies in it. *Id.*, p. 6. Sergeant Boerlein indicated that "our main goal is to - anything that's found, to return it to the owner." *Id.*, p. 8. The property room maintains custody of property for one year. *Id.*, p. 13. The property is handled "by the rules and procedure of the property room." *Id.*, p. 14.

  Officer Prem also emphasized that he tried to help the individuals unlawfully encamped on public property: "So we were trying to get them and steer them to those locations where they could get the help they needed." Prem Deposition., p. 19. He testified: "I would go out a couple days ahead of time . . . . If I came across the people at those locations when I did that, I would tell them we were coming, that they needed to get any of their valuables together because we were going to take all the garbage, the refuse and everything else and clean them out. So anybody I came in contact with at those locations, I gave them that warning." *Id.*, pp. 32-33. He was clear: "I let them take anything. And they were told to take anything that belonged to them. I didn't want to take their personal property. All I wanted to do was clean up the mess that they had there." *Id.*, p. 36. Officer Prem also testified that "there was quite a few people that had warrants outstanding on them." *Id.*, p. 34.

6

Cincinnati Police Officer Branigan corroborated that the debris that needed cleaning in October 2001 included "broken bottles, broken wine bottles, broken beer bottles, cans, plastic, clothes, dirty underwear, soiled underwear; rubbers, condoms, whatever you want to call them; T-shirts, rags, general trash in the ballast area of the underpass . . . . cardboard boxes that are split open . . . trash, underwear, same broken beer bottles, wine bottles, pop bottles, cans, foods bags, foods wrappers . . . ." Branigan Deposition, pp. 13-14.

Officer Branigan testified that in the year 2001 a City employee was only involved in cleanups on October 17-19, 2001. Branigan Deposition, pp. 23, 25. Those days were "the only times that . . . [Officer Branigan had] ever been associated in doing this." *Id.*, p. 23. He knew that Cincinnati police officers were not "involved in anything prior to the involvement that I had in October." *Id.*, p. 25. Officer Branigan suggested that the Ohio Department of Transportation handled the cleanup near Sixth Street and Central Avenue. *Id.*, p. 24.[4] There was only one cleanup in the year 2001 involving a City employee and Community Service probationers, and that occurred in mid-October. Smith Deposition dated February 8, 2002, pp. 20-21. Officer Prem was the only other officer who assisted with cleanup activities prior to Prem's retirement in January 2001. Branigan Deposition, p. 31. In a prior year, Officer Mark Taylor may have assisted with one cleanup before his retirement. *Id.*, p. 32.

Officer Branigan was contacted by Jeff Smith to provide police service because the State of Ohio had contacted Hamilton County to clean up the expressway and some underpasses. Branigan Deposition, pp. 7-8. Officer Branigan and the probationers he was with did not cleanup Fifth Street at Central Avenue. *Id.*, p. 21. He was not under Sixth Street at Gest Street. *Id.*, p. 21. When Officer Branigan encountered individuals at a site, he "told them to get their

---

[4] Officer Branigan described that the State of Ohio provides the Hamilton County Adult Probation Department with trucks to clean up areas that have debris. Branigan Deposition, p. 33.

7

stuff, whatever stuff they had, and to vacate there . . . they were trespassing on state property." *Id.*, pp. 16, 18. He testified that "we provided them with plastic bags to put their belongings in them." *Id.*, p. 18. He let individuals take their property. *Id.*, p. 35. Officer Branigan described that rather than clean every little piece of trash the probationers cleaned the site by placing the trash in bags and passing the bags down, but did not "rake the property down to get it to a fine clean." *Id.*, p. 19.

Officer Branigan identified that the policy of the Cincinnati Police Department, and the policy that he followed, was that if he found property he took it to the district, logged it into the property log, and held it as found property. *Id.*, pp. 35-36. The property was transferred to the Property Room. *Id.*, p. 38. Officer Branigan threw away garbage, but held property like cell phones, shoes, coats, book bags, and similar items. *Id.*, pp. 36-37. He emphasized that "you get your property back. You always - if it's something that is of value, other than garbage . . . . If you find property of value, you take it, you hold it, send it in. It's of no value to me, but it might be of value to somebody else." *Id.*, p. 37.

Jeffrey Smith, the field supervisor for the Hamilton County Adult Probation Department at the time in question, supervised the community service probationers who cleaned sites in mid-October 2001. Smith Deposition dated June 7, 2006, p. 4. He made sure that probationers did their job. *Id.*, p. 5. During the ten years prior to 2001, he had been directed to bring probationers to sites several times. *Id.*, pp. 8-9. Smith testified that in mid-October 2001 he told the probationers to do whatever Police Officer Branigan told them to do. *Id.*, p. 12. Smith did not remember seeing anything other than trash. *Id.*, p. 13. He would not have his probationers throw away any object of value. *Id.*, p. 14. Smith testified that over the years there were times that items of value were brought to him. *Id.*, p. 32. He was not aware of any individuals who had

8

complained about objects of value being thrown away when his probationers cleaned sites. *Id.*, p. 15. Smith explained that individuals at a site are always instructed that they have a specified amount of time to remove personal belongings. Smith Deposition dated February 8, 2002, p. 12. Smith testified that if, for instance, money was found at a site it would be placed in the Police Department Property Room. *Id.*, p. 18.

Consistent with the testimony of Officer Prem, who also testified that individuals at a site were first provided an opportunity to remove their belongings, and that no objects of value were intentionally disposed, Smith testified that when probationers later arrived at a site he allowed a police officer to direct probationers to place the garbage in bags to be "hauled off to the trash, to the dump." Smith Deposition dated February 8, 2002, p. 14. Smith's supervisor, Timothy Shannon, testified that probationer crew chiefs like Smith supervised his own crews during litter abatement activities. Shannon Deposition, pp. 31-32. A police officer just directed the crew to the site that needed abatement. *Id.*, p. 31. Crew chiefs like Smith had the discretion to decide whether objects found at an abatement site were "out of the ordinary" and required further inquiry about their status. *Id.*, p. 33.

The City previously provided its official policies to the Court and incorporates them by reference.[5] Cincinnati Police Department Policy and Procedure 12.715, "Property and Evidence: Accountability, Processing, Storage, and Release," provided: "Police Division personnel are responsible for the inventory of all property which comes into their custody, and also for the inventory of all property when turned over to another source."[6] Standard Operating Procedures

---

[5] City of Cincinnati's Motion for Summary Judgment filed May 10, 2002, Exhibits A-E.
[6] *Id.*, Exhibit D.

also existed for release of property from the Property Room.[7]  Furthermore, City procedures provided for the auction of unclaimed property, including notice by publication in newspapers.[8]

The practice of City and County employees, inmates, or probationers disposing of trash at an unsanitary, unhealthy, and dangerous encampment by bagging it and taking it to the dump is legally unremarkable.  The record is uncontroverted that only trash and other harmful substances were intentionally disposed.  The record is uncontroverted that nobody ever instructed probationers to throw away objects of value.[9]  The record is uncontroverted that there were no prior complaints of alleged unconstitutional conduct.  The record is uncontroverted that the City's policymakers were not involved in controlling the conduct of the City employees who participated in the cleanup activities.  The record is uncontroverted that the City's official policies are constitutional.  The record is uncontroverted that legal procedures like an action in replevin authorize the owner of unlawfully destroyed property to sue for damages.

### III. ARGUMENT

#### A. UNATTENDED OBJECTS UNLAWFULLY LEFT ON PUBLIC PROPERTY BY TRESPASSING INDIVIDUALS ARE NOT CONSTITUTIONALLY PROTECTED PROPERTY INTERESTS

The United States Court of Appeals summarily concluded:  "There can be little doubt that the plaintiffs have a protected property interest in their own items of value."  388 F.3d 539, 542 (6th Cir. 2004).  The City disagrees with this conclusion and seeks to preserve the issue for possible subsequent appellate review.

---

[7] *Id.*, Exhibit E, SOP 9: Release of Property, and SOP 12: Disposal of Property No Longer Needed.
[8] *Id.*, SOP 13, Police Auctions of Unclaimed Property.
[9] Hamilton County Adult Probation Department employee Smith was not informed about City of Cincinnati policies controlling the cleanup of encampments.  Smith Deposition dated June 7, 2006, p. 14.  He never discussed the cleanup of sites with any City official or employee, much less a policymaker of the City.  *Id.*

B.  **THE PLAINTIFFS WERE NOT DEPRIVED OF THEIR RIGHT TO PROCEDURAL DUE PROCESS BY THE CITY OF CINCINNATI**

Since neither plaintiff was deprived of his right to procedural due process by any employee or official of the City of Cincinnati, the City cannot be liable. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001).

C.  **THE CITY OF CINCINNATI DOES NOT HAVE *RESPONDEAT SUPERIOR* LIABILITY**

Even assuming arguendo that a City of Cincinnati employee deprived a plaintiff of his right to procedural due process, the City of Cincinnati does not have *respondeat superior* liability. *Monell v. Dept. of Social Services*, 436 U.S. 658, 691 (1978).

D.  **THE CITY OF CINCINNATI DID NOT HAVE AN UNCONSTITUTIONAL CUSTOM OF DESTROYING PROPERTY WITHOUT PROVIDING PROCEDURAL DUE PROCESS**

A plaintiff seeking to subject the City to 42 U.S.C. §1983 liability for the actions of its employees must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Board of Cty. Commissioners of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997). A plaintiff claiming that a municipal corporation had an unconstitutional custom of tolerating or endorsing unlawful destruction of property that proximately caused injury to the plaintiff must prove:

1)  The existence of a clear and persistent pattern of illegal activity;
2)  Notice or constructive notice on the part of City policymakers;
3)  The City policymakers' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and
4)  That the City's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Circuit 2004) (citing *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)). The plaintiff has to prove a "consistent and

11

pervasive pattern" of misconduct that was deliberately ignored by the City's policymakers. *Berry v. City of Detroit*, 24 F.3d 1342, 1346 (6th Cir. 1994). Where, as here, the City's relevant policy is "not *itself* unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the 'causal connection' between the 'policy' and the constitutional deprivation." *Oklahoma v. Tuttle*, 471 U.S. 808, 824 (1985). The plaintiffs in the case at bar cannot prove any of the elements of their unconstitutional custom claim. Nor can they even establish a genuine issue of material fact sufficient to preclude judgment in favor of the City. The Supreme Court defined "materiality" and "genuine" for purposes of summary judgment considerations: "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson, et al. v. Liberty Lobby, et al.*, 477 U.S. 242, 248 (1986). Furthermore, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

      The uncontroverted evidence proves that low level City employees organized a coordinated response to the complaints received about unsanitary, unhealthy, and dangerous encampments. The uncontroverted evidence proves that the City employees exercised all due regard to protect objects of value that individuals might desire to preserve. They did not act unconstitutionally. There were no complaints, prior to this lawsuit, about alleged unconstitutional conduct. Policymakers of the City were therefore never apprised of alleged unconstitutional conduct. The policymakers consequently also did not knowingly choose to disregard the risk that subsequent unconstitutional conduct would occur. The plaintiffs cannot

prove any of the elements of an unconstitutional City custom of depriving individuals of their right to procedural due process.

The testimony and affidavits of Officers Prem and Branigan, and the exhibits presenting the City's policies for "lost and found" property, prove that there is no municipal culpability. Even assuming the truth of Smith's testimony that he did not observe his probationers sort objects at the unhealthy and unsanitary encampments, including during the one instance in 2001 that a City employee participated in a cleanup, that is a wholly unreasonable basis upon which to permit a jury to infer that the City of Cincinnati had an unconstitutional custom of depriving individuals of property without due process of law. City employees gave prior notice to individuals to remove their belongings. Even assuming *arguendo* that in the course of the cleanup of a site in mid-October 2001, objects valuable to the plaintiffs were inadvertently disposed, that disposal was not unconstitutional. Furthermore, even also assuming *arguendo* that the inadvertent disposal was unconstitutional conduct, that conduct was not proximately caused by an unconstitutional custom of the City of Cincinnati.

There are no genuine issues of material fact and the City is entitled to judgment in its favor as a matter of law.

### E. STATE REPLEVIN LAW SATISFIES THE REQUIREMENTS OF PROCEDURAL DUE PROCESS

The plaintiffs conceded the availability of a procedural remedy: "Ohio law makes it clear that every individual has a right to his or her own personal property and may bring an action in replevin to protect that right. Ohio Rev. Code §2737.02 . . . ."[10] Damages may be recovered in an action in replevin. *Jedlicka v. Good Mechanical Auto Co.*, 21 Ohio App.3d 19, 486 N.E.2d 121 (1984). An alleged due process deprivation is not actionable and complete "unless and until

---

[10] Brief of Appellants (Plaintiffs), Sixth Circuit Case No. 03-3916, p. 9, n. 6.

13

the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the state provided, and whether it was constitutionally adequate." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990). An alleged due process claim requires the judiciary to "examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, <u>and any remedies for erroneous deprivations provided by statute or tort law</u>." *Zinermon v. Burch*, 494 U.S. at 126 (emphasis added). The plaintiffs conceded the availability of a procedural remedy and there was no deprivation of due process. There are no genuine issues of material fact. The City's motion for summary judgment should be granted.

### F.  NOTICE PUBLISHED IN THE NEWSPAPER OF THE CITY'S SCHEDULED SALE OF "LOST AND FOUND" PROPERTY SATISFIES THE REQUIREMENTS OF PROCEDURAL DUE PROCESS

The City's policy of publishing notice in the newspaper of the upcoming sale of items held in the Police Department Property Room is constitutionally sufficient.[11] Notwithstanding that this Court previously concluded that the City's notice by publication was constitutionally sufficient, the Sixth Circuit panel held: "This is an issue for the district court to resolve on remand." The Sixth Circuit panel apparently believed that the educational and financial characteristics of the plaintiffs could possibly render notice by publication unconstitutional. In fact, as described above, the plaintiffs regularly read newspapers. They also both knew that newspapers contain legal notices. The Sixth Circuit's concern is moot. There are no genuine issues of material fact. The City's policy of publishing notice of its auction of "lost and found" property is constitutional.

Due process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pending action and afford them an opportunity to present their

---

[11] R.C. §737.32 also provides for the sale of unclaimed property at public auction after notice by publication.

14

objections. *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 314 (1950). Earlier this year, the Supreme Court reiterated that principle. *Jones v. Flowers*, 126 S.Ct. 1708, 1713-14 (2006). While notice by publication may not be enough with respect to a person whose name and address are known or very easily ascertainable, it is sufficient when the name and address of the interested party are unknown. The United States Court of Appeals held that "[w]here a valid address is not reasonably ascertainable, then publication alone is adequate to satisfy due process." *Karkoukli's, Inc. v. Dohany, et al.*, 409 F.3d 279, 285 (6th Cir. 2005). The Court added: "This Court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning." *Id.*

In *Higashi v. U.S.*, 225 F.3d 1343, 1348-49 (Fed. Cir. 2000), the Federal Circuit ruled that notice by publication was sufficient to inform persons of Japanese ancestry who were relocated during World War II of the United States' lifting of restrictions. In *Fogel v. Zell*, 221 F.3d 955 (7th Cir. 2000), notice by publication was neither fair nor appropriate in bankruptcy cases in which potential claimants were all known purchasers of pipeline manufactured by the debtor's predecessor. The Seventh Circuit emphasized that notice by publication "may thus be entirely appropriate when claimants are . . . unknown . . . ." *Id.*, p. 963.

In *United States v. Woodall*, 12 F.3d 791, 794 (8th Cir. 1993), the Eighth Circuit held: "When the government has actual knowledge of an interested party's whereabouts at the time forfeiture is commenced, failure to direct the statutorily required personal notice to that address cannot be considered compliance with either the statute or minimum due process standards." In *U.S. v. 194.08 Acres of Land, More or Less Situated in St. Martin*, 135 F.3d 1025, 1031 (5th Cir.

15

1998), the Fifth Circuit held that publication notice is constitutionally inadequate where the owner could be informed by more effective means.

In the case at bar, the claimants for "lost and found" items left by trespassers on public property were unknown. It was not practicable to identify the trespassers. Plaintiff Wahoff testified, for instance, that when he observed an encampment being cleaned he "made a big U-turn and got the hell away from there because I didn't want to go to jail for criminal trespassing." Wahoff deposition, p. 14. Unlike *Jones v. Flowers*, *supra*, where the owner of real property was known to the government and publication notice of the tax foreclosure sale of his home was not adequate, Wahoff and Garcia were unlawful trespassers not known to the City. Therefore, publication notice was constitutionally adequate. Moreover, the plaintiffs testified that they read newspapers and were aware of the legal notices section of the newspapers. The City's motion for summary judgment on the plaintiffs' claim that the City did not provide constitutionally adequate notice should be granted.[12]

## IV.   CONCLUSION

The City of Cincinnati was not involved in any way in the alleged destruction of plaintiff Garcia's property. Even assuming *arguendo* that Officer Branigan provided services at the site where plaintiff Wahoff alleges his property was destroyed, there is no evidence whatsoever that Wahoff's property was destroyed as the result of an unconstitutional custom of the City of Cincinnati. Moreover, even assuming the onsite destruction of Wahoff's unattended property while he was trespassing, Ohio law provided all the process that was due. Finally, alternatively assuming that Wahoff's property was not destroyed onsite as he alleges, but rather was taken to the Property Room, City procedures provided for notice by publication in the newspaper prior to

---

[12] The plaintiffs, of course, claim that their property was disposed onsite. Thus, the plaintiffs do not have standing to challenge the City's publication by notice procedures and that claim is essentially moot.

destruction of unclaimed property. Under either scenario, Wahoff was not deprived of his right to procedural due process.

There are no genuine issues of material fact. The City is entitled to judgment in its favor as a matter of law. The City's motion for summary judgment should be granted.

Respectfully submitted,

JULIA L. MCNEIL (0043535)


s/ Richard Ganulin
RICHARD GANULIN (0025642C)
Assistant City Solicitor
Room 214, City Hall
801 Plum Street
Cincinnati, Ohio 45202
(513) 352-3329
(513) 352-1515 FAX
richard.ganulin@cincinnati-oh.gov

Trial counsel for defendant City of Cincinnati


## CERTIFICATE OF SERVICE

I hereby certify on July 21, 2006 a true and accurate copy of the foregoing City of Cincinnati's Motion for Summary Judgment and Memorandum in Support was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed to those parties by certified mailed who are not served via the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Richard Ganulin
RICHARD GANULIN (0025642C)
Assistant City Solicitor


CashMSJ 0706-RG/(skj)