1              IN THE UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF OHIO

3                     WESTERN DIVISION

4    ------------------------------------------------

5    GREGORY CASH AND CLARA CASH :
     AND GREGORY B. WAHOFF AND   :
6    PHILLIP GARCIA AND ROCKY    :
     WAYNE ADKISSON,             :
7         Plaintiffs,            :
          -vs-                   :   C-1-01-753
8    HAMILTON COUNTY DEPARTMENT  :
     OF ADULT PROBATION AND      :
9    MICHAEL WALTON AND CITY OF  :
     CINCINNATI,                 :
10        Defendants.            :

11   ------------------------------------------------

12           Deposition of JEFFREY A. SMITH a Witness

13   herein, taken by the Defendants as upon direct

14   examination and pursuant to the Federal Rules of

15   Civil Procedure as to the time and place and

16   stipulations hereinafter set forth, at the offices

17   of Hamilton County Prosecutor's Office, 230 East

18   Ninth Street, Cincinnati, Ohio, at 9:30 a.m. on

19   Wednesday, June 7, 2006, before Lisa K. Keller, a

20   Registered Professional Reporter and Notary Public

21   within and for the State of Ohio.

22

23              *    *    *    *    *    *

24

25

1                    QUICK REFERENCE INDEX

2        WITNESS:  JEFFREY A. SMITH

3        APPEARANCES:   PAGE 3

4

5                          DX   CX   RDX   RCX

6     BY: MR. GANULIN     4    -      34    -

7     BY: MR. FELSON      -    16     -     36

8     BY: MR. STEVENSON   -    31     -     37

9

10                       EXHIBITS

11            IDENTIFIED                      PAGE

12    PLF'S:        -                          -

13    PLF'S:        -                          -

14    PLF'S:        -                          -

15

16                INFORMATION REQUESTED

17

18                  Not Applicable

19

20              *    *    *    *    *

21

22

23

24

25

1    <u>APPEARANCES:</u>

2    ON BEHALF OF PLAINTIFFS

3        Mr. Stephen Felson
         Attorney at Law
4        CBLD Center
         Suite 1650
5        36 East Seventh Street
         Cincinnati, Ohio  45202
6
     ON BEHALF OF DEFENDANTS
7
         Mr. Rick Ganulin
8        Attorney at Law
         801 Plum Street
9        Cincinnati, Ohio  45202

10       Mr. David T. Stephenson
         Attorney at Law
11       Assistant Prosecuting Attorney
         230 East Ninth Street
12       Suite 4000
         Cincinnati, Ohio  45202
13
     ALSO PRESENT
14
         Ms. Amy Diers
15

16                *    *    *    *    *    *

17

18

19

20

21

22

23

24

25

1    <u>WHEREUPON</u>:

2                          JEFFREY A. SMITH,

3    of lawful age, a witness herein, being first duly

4    sworn as hereinafter certified, testified as

5    follows:

6                    <u>DIRECT EXAMINATION</u>

7    BY MR. GANULIN:

8         Q.   Good morning, Mr. Smith.  Please state

9    your full name and address.

10        A.   Jeffery A. Smith, 800 Broadway,

11   Cincinnati, Ohio, 45202.

12        Q.   And you previously gave deposition

13   testimony in this case; is that correct?

14        A.   Yes, sir.

15        Q.   You were formerly employed as a field

16   supervisor for the Hamilton County Adult Probation

17   Department; is that correct?

18        A.   Yes, sir.  I still am.

19        Q.   You're still employed in that capacity?

20        A.   Yes, sir.

21        Q.   Would you describe -- and when did you

22   assume those responsibilities, about?

23        A.   13, 14, 15 years ago.  I don't know the

24   exact date.  I was part-time at the time.

25        Q.   And you have managerial

1    responsibilities to oversee probationers?

2         A.   Yes, sir, I do.

3         Q.   First of all, what's a probationer?

4         A.   A probationer is a person directed by

5    the Court to do community service that goes out on

6    detail.

7         Q.   And are your responsibilities to

8    oversee the probationers doing their work?

9         A.   To oversee the probationers, see that

10   they do their job responsibly, and to maintain a

11   good working order with the probationers and

12   hopefully no one will get hurt.

13        Q.   Are you on a job site with them?

14        A.   Yes.

15        Q.   You make sure they do their job?

16        A.   Yes, as directed.

17        Q.   Who do you report to in the

18   organization?

19        A.   Mr. Rajagopal, director of community

20   service.

21        Q.   Spell that for the reporter.

22        A.   R-A-J.

23             MR. STEVENSON:  He's going to be

24   here.  His first in his P-A-K-K-I-R-I, and last

25   name R-A-J-A-G-O-P-A-L.

1    BY MR. GANULIN:

2            Q.   And do you know who he reports to?

3            A.   The assistant chief of the department.

4            Q.   And that's the Hamilton County Adult

5    Probation Department?

6            A.   Yes.

7            Q.   And that person reports to the chief, I

8    assume?

9            A.   I assume also.

10           Q.   And do you know who the chief of the

11   Probation Department reports to?

12           A.   I have no clue.  I don't know.  My

13   assumption would be the judges who govern our body,

14   our division.

15           Q.   Perhaps the Hamilton County

16   administrator?

17                    MR. STEVENSON:  Rick --

18                    THE WITNESS:  I don't know.

19                    MR. FELSON:  That's a good enough

20   answer, if he doesn't know.

21                    MR. GANULIN:  That's fine.  We'll

22   clear that up.

23   BY MR. GANULIN:

24           Q.   I assume each department within the

25   Hamilton County government is managed by the

1     administrator of Hamilton County; do you know?

2           A.   I don't know.

3           Q.   If you don't know, that's fine.

4           A.   I don't know.

5           Q.   Now, you previously testified, if you

6     remember, that you were at the site of a cleanup in

7     October of 2001 underneath the Fifth Street viaduct

8     west of Central Avenue.  Do you remember being at

9     that site in October of 2001?

10          A.   I remember the site, but I don't

11    remember the exact date.

12          Q.   But you remember being there because

13    you brought a group of probationers there to do a

14    cleanup?

15          A.   Yes.

16          Q.   Do you remember who directed you to

17    bring the probationers to that site?

18          A.   No, I do not.

19          Q.   Do you remember your testimony when you

20    were deposed in February of 2002 concerning that

21    issue?

22          A.   No, I do not remember what I said.

23          Q.   And today you don't remember who

24    directed you to bring the probationers to that

25    site?

1              A.   No, I do not.

2              Q.   That site was underneath an interstate

3     highway; is that correct?

4              A.   Yes.

5              Q.   Do you know if that was State of Ohio

6     property?

7              A.   I do not.

8              Q.   You do not know?

9              A.   I do not know.

10             Q.   Do you remember approximately how often

11    you were directed to bring probationers to sites

12    for cleanup activities?

13             A.   Honestly, no.  Not very often, not many

14    times at all.

15             Q.   That was the only time, in fact, in

16    2001, is that correct, that you were directed to

17    bring --

18             A.   It could be.  I don't remember.

19             Q.   In 2001 you had been on the job for

20    perhaps about ten years?

21             A.   Ten years, I believe.

22             Q.   Roughly how many times during those ten

23    years, more or less, were you directed to bring

24    probationers to sites?

25             A.   Several times.  I don't remember the

1   exact number.

2                        MR. FELSON:  I'm going to object

3   or ask for clarification.  When you say sites, all

4   sites?  Homeless sites?  City sites?  County sites?

5                        MR. GANULIN:  Any site within the

6   City of Cincinnati, whether it was State of Ohio

7   property or City of Cincinnati property or any

8   other property.  How many times were you --

9                        THE WITNESS:  I don't remember the

10  exact number, but several over the years.

11  BY MR. GANULIN:

12       Q.  Just so we're clear, over a period of

13  about ten years, several times?

14       A.  Yes.

15       Q.  Do you recall if you were ever

16  contacted directly by any City of Cincinnati

17  employee to bring probationers to a site?

18       A.  Not that I'm aware of.

19       Q.  Your testimony today is that you don't

20  recall ever being contacted by a City of Cincinnati

21  employee directly to bring probationers --

22       A.  No, sir.

23       Q.  And so as far as you recall, would you

24  have been directed by one of your superiors of the

25  organization where you needed to be on a certain

1    day?

2              A.    Yes.

3              Q.    That's the normal -- today for

4    instance, if you need to bring a group of

5    probationers to a site, would you be directed by

6    one of your superiors in the organization to bring

7    those probationers to that site?

8              A.    Yes, Raj, yes.

9              Q.    And although you don't remember

10   specifically you said, in October of 2001, it's

11   likely that if you were directed to bring

12   probationers to a site, it would have been by a

13   superior in your organization?

14             A.    As far as I -- yes.

15             Q.    To the extent you may have testified in

16   your earlier deposition that you assumed or knew

17   that a Cincinnati Policeman contacted to you to

18   bring probationers to that site -- strike all that.

19                   In October of 2001 when you

20   brought the probationers to the site, when you

21   brought the probationer to the site underneath the

22   Fifth Street viaduct west of Central Avenue, did

23   you go down to the site to manage their work?

24             A.    I took the probationers to the site and

25   then the policeman directed them what to do.

1          Q.   Were you there when the -- which

2     policeman was that?

3          A.   I believe it was Branigan.

4          Q.   Do you remember if he was there when

5     you arrived or did he arrive after you?

6          A.   I believe we followed him to different

7     sites, Officer Branigan.

8          Q.   On that day?

9          A.   I believe so.  I don't remember sitting

10    here talking about it now in the deposition, but I

11    don't remember if we went to other sites or not,

12    but we were under the policeman's directive.

13         Q.   That's my question.  You spoke to him

14    when you arrived at the site?  Do you remember?

15         A.   No, I do not.

16         Q.   When you say he directed the

17    probationers, were you there to hear him direct the

18    probationers?

19         A.   I don't remember.  I do not remember.

20         Q.   I'm just trying to determine the basis

21    for your assertion before that the probationers

22    were directed by a Cincinnati policeman, in this

23    case you're saying Police Officer Branigan --

24         A.   I believe it was Branigan.  I wouldn't

25    swear to it.

1          Q.  How do you know that he directed them

2  if you weren't there to hear him direct?

3              MR. FELSON:  Objection.  He said

4  he can't remember if he was there to hear him, not

5  that he wasn't there.

6              MR. STEVENSON:  Go ahead and

7  answer, if you can.

8              THE WITNESS:  What was the

9  question again?

10  BY MR. GANULIN:

11          Q.  How do you know that Policeman Branigan

12  directed the probationers, if you were not there to

13  hear him direct?

14          A.  Because I told the probationers do

15  whatever the police officer tells them to do.

16          Q.  How far away from the cleanup site were

17  you that day?

18          A.  I was obviously right there with the

19  probationers at the scene, at the site.

20          Q.  You weren't sitting in a vehicle

21  removed from the site?

22          A.  No, no, I was on the site.

23          Q.  Were you standing there on the site

24  with the probationers?

25          A.  I probably was sitting in the van

1    watching them.

2            Q.   So was the van --

3            A.   On the site, the vehicle was on the

4    site of the cleanup.

5            Q.   And did you observe the probationers

6    working?

7            A.   Yes.

8            Q.   Do you remember seeing anything that

9    was not trash at the site?

10           A.   No, sir.

11           Q.   So, as far as you were aware, when you

12   were there at the time, the probationers were just

13   cleaning up a site filled with trash?

14           A.   Correct.

15           Q.   Assuming there was something of value

16   at the site, I don't know what in your experience

17   you ran across that might have value at a site like

18   that, but let's say there was a tent pitched at the

19   site, would you save a tent that was at the site or

20   would you throw it away?

21           A.   Personally would I throw it away?  No.

22           Q.   Would you make sure your probationers

23   did not throw it away?

24           A.   I couldn't tell you if they did or

25   didn't.  I cannot remember.

1          MR. STEVENSON:  Jeff, listen to

2     the question that's being asked.

3     BY MR. GANULIN:

4          Q.   At this point generally in fulfilling

5     your responsibilities to manage a group of

6     probationers cleaning up any site, if you were

7     there and saw an object of value --

8          A.   No, I would not have them throw it

9     away, no.

10          Q.   Did you ever have any conversations

11     with any city official from a City Council member

12     from the City Manager on down through all the city

13     employees, did you have any conversation with any

14     city official or employee about how your

15     probationers clean up sites?

16          A.   Not that I remember, no.

17          Q.   Are you aware of any city ordinance or

18     other city policy, City of Cincinnati ordinance or

19     policy or any other rule or regulation of the City

20     of Cincinnati procedure that controls the cleanup

21     of sites like this?

22          A.   No, I am not.

23          Q.   Are you aware of any occasions in the

24     context of your fulfilling your responsibilities

25     where, and I'm speaking about prior to October of

1       2001, any occasions where people had complained

2       about objects of value being thrown away when your

3       probationers cleaned up sites?

4              A.   No, I am not.

5              Q.   You previously testified that before a

6       cleanup of one of these sites occurred, that

7       Cincinnati policemen would give notice to people

8       present at the site and give them an opportunity to

9       remove whatever they wanted to; is that correct?

10             A.   If that's what I stated, I'm sure it

11      was.  I don't remember at this time.

12             Q.   You don't remember whether anybody in

13      the employ of the State of Ohio from the Ohio

14      Department of Transportation or any other

15      department or division of the State of Ohio

16      communicated with Hamilton County to arrange for

17      the cleanup of this particular site that we're

18      discussing today which is underneath the Fifth

19      Street viaduct west of Central?

20             A.   No, sir, I would not.

21             Q.   You're aware, I believe, that Hamilton

22      County had a contract with the State of Ohio to

23      clean up the State of Ohio property and Hamilton

24      County had a separate contract with the City of

25      Cincinnati to clean up City of Cincinnati property;

1    is that correct?

2              A.  I know they had some contracts

3    fulfilling those two organizations or working with

4    the two organizations.

5                   MR. GANULIN:  That's all I have.

6                   CROSS EXAMINATION

7    BY MR. FELSON:

8              Q.  Mr. Smith, I'm Steve Felson for the

9    Plaintiffs.  A few extra questions here.  You

10   mentioned that you were called several times in the

11   course of your service here doing these cleanup

12   sweeps.  Are those the words you used, correct?

13             A.  I don't remember the exact words I

14   used, but we have done it several times to help.

15             Q.  Okay.  Are you -- were any of the

16   sweeps that you -- we've defined homeless sweeps in

17   this litigation because homeless -- the people who

18   are Plaintiffs in this case were sleeping under

19   some of these -- on some of these sites, as you may

20   recall that from talking to your attorney or from

21   your prior knowledge.  We define homeless sweeps as

22   cleanup operations in places where homeless people

23   are spending the night.  Just so when I use that

24   term, that's what we're talking about.  Okay?

25             A.  Okay.

1          Q.   Now, do you recall knowing that there

2     were homeless people sleeping in some of these

3     sites, correct?

4          A.   I --

5          Q.   Put it this way, have you ever run into

6     sites in the City of Cincinnati where homeless

7     people were sleeping?

8          A.   Yes.

9          Q.   You've actually seen that; haven't you?

10         A.   On occasion.

11         Q.   Okay.  Have you ever brought

12    probationers to clean up sites where -- to clean up

13    homeless sites as I've defined it?

14         A.   Individually by myself?

15         Q.   Yeah.

16         A.   Without the --

17         Q.   No, no.  Have you ever participated in

18    any cleanup of homeless sites?  That's my question.

19    Is that ambiguous?

20              MR. STEVENSON:  No, I want to make

21    sure he understands what you're driving at, but I

22    think that last question should do it.  If you can

23    read that back.

24              (The requested portion was read

25    back.)

1                        THE WITNESS:  Yes.

2     BY MR. FELSON:

3          Q.  And I'm saying this because the word

4     sites was used earlier by Mr. Ganulin and I asked

5     him to clarify that, but he stuck with the word

6     sites and I'm interested in sweeps of homeless

7     sites, and you have participated in that and there

8     was testimony of course before, a few years ago?

9                    MR. GANULIN:  Objection.  He

10    didn't say he participated in homeless sweeps,

11    which is the word you used.

12                    MR. FELSON:  Cleanup operation of

13    homeless sites, so we don't mess anything up here.

14                    MR. GANULIN:  I'll make the same

15    objection.  He didn't say participated in

16    operations.  He said he saw a site, a homeless

17    site.

18                    MR. FELSON:  Let's go off the

19    record.

20                    (Off the record discussion.)

21    BY MR. FELSON:

22         Q.  Now, I'm going to ask, just to help me,

23    you mentioned the word sweep as possibly having

24    some other meaning or did I get that right?

25         A.  I never mentioned sweep.  You did.

1          Q.   Does a sweep have any special meaning

2     in your job?

3          A.   None whatsoever.

4          Q.   Okay.  Now, I understand you've already

5     testified that you had no particular recollection

6     of October this or that and so on and what happened

7     in a particular cleanup?

8                    MR. STEVENSON:  Jeff, I'm going to

9     caution you again.

10                   THE WITNESS:  You're correct.

11    BY MR. FELSON:

12         Q.   I'll go to the end of the question.

13    And you gave some general answer, but specific

14    recollection of something that happened all these

15    years ago, I understand that you didn't have that.

16                   Do you recall whether these

17    cleanups would be instigated by -- ever instigated

18    by a call from the Cincinnati police?

19                   MR. GANULIN:  Object to the

20    question, but go ahead and answer it if you can.

21                   THE WITNESS:  I don't know.

22    BY MR. FELSON:

23         Q.   All right.  That's an answer.  The term

24    community service is used around here on occasion.

25    What does that mean?

1          A.   The Court order's a probationer to do

2     community service usually instead of incarceration

3     as part of their punishment.

4          Q.   Do I have it correct that generally you

5     would be bringing over probationers who are doing

6     court-ordered community service?

7          A.   Uh-huh.

8               MR. STEVENSON:  Yes or no?

9               THE WITNESS:  Yes.

10    BY MR. FELSON:

11         Q.   You mentioned that you recall, at least

12    on occasion, being in the van while this cleanup

13    was taking place, correct?

14         A.   Correct.

15         Q.   And you also mentioned the vehicle was

16    on the site?

17         A.   Correct.

18         Q.   Does that mean you would pull up over

19    the curb?

20         A.   No, sir, you're on the roadway.

21         Q.   On the roadway?

22         A.   Yes, sir.

23         Q.   When you said on the side, you just

24    meant close by?

25         A.   Within -- able to supervise the

1    probationers and visually see them.

2         Q.   Visual contact you would have?

3         A.   Yes.

4         Q.   And close enough that if a question

5    came up, you would be there?

6         A.   Oh, absolutely.

7         Q.   Now, you also mentioned that you would

8    instruct the probationers to do what the officer

9    said?

10         A.   Yes.

11         Q.   So presumably an officer would, for the

12    most part of your recollection, would be around

13    also?

14         A.   They would be there, yes.

15         Q.   And the officer would have his own

16    vehicle; is that correct?  Ordinarily?

17         A.   Yes.

18         Q.   In your experience, if you recall,

19    would the officer stay in his vehicle or would he

20    be up closer to the probationers, if you have any

21    recollection?

22         A.   I don't remember.

23         Q.   Might be one might be true?  You don't

24    have a recollection?

25         A.   It could be, yes.  I have no

1    recollection.

2          Q.  Have you ever -- do you recall any

3    conversation you ever had with any probationer

4    about cleanup operations -- I wouldn't use that

5    word -- about the cleanup of these sites?

6          A.  No, sir.

7          Q.  And do you recall speaking with any

8    county personnel back in the office about cleanup

9    of sites and how it works?

10          A.  No, sir.

11          Q.  What I'm hearing is these are very

12    routine operations, they don't excite a lot of

13    conversation?

14               MR. GANULIN:  Object to the

15    question, but if you understand it.

16               MR. STEVENSON:  If you understand

17    it, go ahead and answer.

18               THE WITNESS:  If we were directed

19    to go there, we went there, we went to the site.

20    BY MR. FELSON:

21          Q.  You don't recall these cleanups raising

22    any questions that you had to ask somebody about?

23          A.  No, sir, I don't remember.

24          Q.  Okay.  Would the same be true regarding

25    city personnel?  Let's say these police officers,

1    did you ever discuss with any police officer how

2    you clean up or problems that arose or anything of

3    that nature?

4            A.   No, sir, not that I'm aware of.

5            Q.   Okay.  I'm going to ask -- I'm going to

6    show you a couple of exhibits I have here, just so

7    I can understand some of these, and we'll see if

8    this is something you can help me with.

9                    Plaintiff's Exhibit 1 I'm going to

10   hand to you, and I've got a copy.  Of course the

11   attorneys have these from elsewhere, and I'll

12   represent that I received these from the attorney

13   for Hamilton County.

14                    I just want to know what this is,

15   who fills it out, if you can just tell me in

16   general.  There are probably two parts to it.

17   Community service roster, is that what you call

18   this first page?  There are six, seven, maybe it's

19   all the same, I'm sorry, 13 pages actually which

20   look like the same form.  Is that what you have

21   there?

22           A.   Yes, sir, it is.

23           Q.   And the community service roster, what

24   is this used for, this roster, if you know?

25           A.   The roster of the probationers that are

1    to report for community service.

2            Q.  Do you see these in the course of your

3    duties?

4            A.  Most of the time I do not.

5            Q.  You don't see these.

6            A.  I would be search -- at this time when

7    this was taking place, I was searching the

8    probationers in the morning.  They go through the

9    x-ray machine so they are not carrying anything

10   illegal and they empty their pockets out.

11           Q.  Who would generate this report?

12           A.  At the time, I don't know who would

13   have been doing it.

14           Q.  So you would rarely, if ever, see this?

15           A.  Seldom.

16           Q.  What would be the occasion when you

17   would see it?

18           A.  I can't think of any honestly.  You

19   take your assignment and if you had a problem, you

20   report it back to the boss and check on the

21   paperwork.  I seldom looked at these.

22           Q.  You knew they were around?

23           A.  I knew they were around, but I seldom,

24   like I said, looked at them.

25           Q.  Can I ask you in your general

1    experience, is this a way that probationers who put

2    in time on community service were credited with

3    that time?

4         A.   Yes.

5         Q.   And who would fill in the seven, seven,

6    I assume those are hours?

7         A.   Right.  I have no idea who was doing it

8    at the time, but it's a random pick, it's whoever

9    comes through the line.  You're assigned to

10   supervisors and your time would be marked down,

11   seven hours according to that date, next to the

12   name.

13        Q.   You can't tell from this where the

14   person was putting in his time?

15        A.   No, sir.

16        Q.   Is there anywhere to tell where a

17   probationer was putting in time, any form?

18        A.   Not that I'm aware of.

19        Q.   Okay.  Now under notes you'll see

20   something, the first person Marquita Abernathy, it

21   says VOA?

22        A.   Volunteers of America.

23        Q.   What's that refer to?

24        A.   People under light duty would be

25   assigned to those, usually a sit-down job, and I

1    don't know what they did.  VOA, we call it light

2    duty assignments.

3         Q.   That would be somebody that was not

4    supposed to go out and do heavier --

5         A.   If they had a restriction, maybe

6    lifting, maybe could have a heart problem.

7         Q.   So it would be a medical --

8         A.   Health issue, medical issue.

9         Q.   Okay.  And they would go to a -- there

10   was a sit-down job of some kind, Volunteers of

11   America?

12        A.   I don't know if it was specifically

13   sit-down.  I know it was for light duty.

14        Q.   Do you know what AWC is, about

15   two-thirds of the way down?

16        A.   Approach with caution.

17        Q.   Really?

18        A.   I shouldn't say that because I'm not

19   sure.

20        Q.   That's a note that somebody put on

21   there?

22        A.   It's printed on there.  It's not

23   handwritten, it's typed.

24        Q.   Approach with caution, and yet the

25   person was still out doing his probation?

1             A.   Yes, sir.

2             Q.   It sounds like a warning of some kind

3    to whoever is supervising?

4             A.   It could be.   That's the first I saw it

5    on this sheet.   I seldom saw these before.

6             Q.   So you would be out with somebody, you

7    wouldn't know if there was an approach with caution

8    note on there?

9             A.   I don't remember.

10            Q.   Okay.   On page four, I just -- I don't

11   know whether any of these have any importance, but

12   just for my own information at least, I see an EMU

13   a couple of places.   Do you know what that means?

14            A.   Electric monitoring unit.

15                 MR. STEVENSON:   It's actually

16   electronic.

17   BY MR. FELSON:

18            Q.   And that was the person that had

19   something on his leg or something like that?

20            A.   Yes, sir.

21            Q.   Okay.   Let's go on to Number 2, and

22   again, that's the original.   You can just leave

23   that there, and let me see if I have one each

24   marked and now here we have, oh, a community

25   service roster.   The first page looks like the

1    others.  Oh, clerical crew, what does that mean?

2    That's why I separated them.  Any idea?

3              A.  I'm assuming they'd be sent to the

4    office to help file.

5              Q.  The law library down here?

6              A.  Yeah.

7              Q.  For whatever reasons, these are people

8    that are not out on a work crew; would you agree

9    with that?

10                  MR. STEVENSON:  I'm going to

11   object.  You mean not outside on a work crew?

12                  MR. FELSON:  Maybe so, yeah.

13   Well, the word clerical, I'm sure you know exactly.

14   Why don't you tell me.

15                  MR. STEVENSON:  You know, Steve,

16   my objection to this document is foundational with

17   respect to him.  If you know the answer to the

18   question, Jeff, answer the question.

19                  MR. FELSON:  No, no, no.  Let's

20   move on.  That's good enough for me.

21   BY MR. FELSON:

22             Q.  Let's take a quick look at Number 3.

23   Now, you should have something in front of you

24   that's got handwritten 10-10-00, Tuesday, on it and

25   community service program typewritten.  Do you have

1     that?

2              A.   It's handwritten, it's not typed.

3              Q.   The date is handwritten, correct?

4              A.   Correct.

5              Q.   And it's captioned community service

6     program, correct?

7              A.   Yes.

8              Q.   Now, it says weekday locations.  Do you

9     know this form at all?

10             A.   Again, I never did this part of the

11    paperwork.

12             Q.   Okay.  Have you seen this form before?

13             A.   Yes.

14             Q.   Do you know what it's for?  Weekday

15    locations, it says, but I'm just trying to get a

16    handle on what it's about.

17             A.   Distribution, number of people going to

18    each supervisor for community service.

19             Q.   Okay.  Is your name on here?  Is that

20    you, JS, one of the JS's?

21             A.   Yes, it would have to be.

22             Q.   Okay.  There's a second JS with a small

23    S.  Any idea what that was?

24             A.   Another supervisor with the same

25    initials.

1        Q.  So these look like, across the top,

2   initials of supervisors?

3        A.  Yes, sir.

4        Q.  And would this be, would this be some

5   kind of a form that would tell somebody which

6   probationers are going with which supervisor or do

7   I have that wrong?

8        A.  Yes, sir.

9        Q.  That's correct?

10       A.  Yes, sir.

11       Q.  And you'll see on the third page, they

12  are not paginated, but the third page says

13  Wednesday it's got a different name.  Under your

14  initials, the first one had Morgan and Huffman or

15  something like that, and suddenly we have second

16  date, Terrance Woods.  So that would be who you

17  would be going out with on the second day, on the

18  Wednesday?

19       A.  Who were the names again?

20              MR. STEVENSON:  Steve I'm going to

21  object.

22              MR. FELSON:  Just one point.  Let

23  me get through this and we'll be done.

24  BY MR. FELSON:

25       Q.  This was not given to you to tell you

1     who you went out with.  Somebody else used this and

2     assigned people to your crew; is that correct?

3              A.   I would get a list of the people.

4     They'd write it out each day who you got.

5              Q.   But it wouldn't be on this form?

6              A.   No, sir.

7              Q.   It would be a blank piece of paper, and

8     they'd tell you who you have, your people with you?

9              A.   Yes, sir.

10                       MR. FELSON:  That's all I have.

11                       MR. STEVENSON:  Jeff, I have just

12    a couple of follow-up questions.

13                        CROSS EXAMINATION

14    BY MR. STEVENSON:

15             Q.   When you went to the homeless sites

16    that Mr. Felson was talking to you about during the

17    several times that you went to those, did you ever

18    find people there?

19             A.   Yes.

20             Q.   All right.  When you found people

21    there, were they given an opportunity to remove

22    items of value?

23             A.   As far as I can remember.

24             Q.   Okay.  Now, during your employment as a

25    community supervisor, community service supervisor,

1      were items of value ever brought to you?

2              A.    From the sweeps?

3              Q.    Not from the sweeps.  Ever?

4              A.    Oh, yes, yes, quite often actually.

5              Q.    What do you do with items of value that

6      are brought to you?

7              A.    Let's say, for example, if it's in the

8      city, in the District One region within their

9      jurisdiction, you take it to the local district,

10     the local municipality, whether it be Colerain

11     Township, the jurisdiction, the Highway Patrol's

12     jurisdiction.  You return it to their jurisdiction.

13             Q.    So this was not an infrequent

14     occurrence that items of value would be brought to

15     you?

16             A.    No.

17             Q.    All right.  When you went to the City

18     of Cincinnati homeless sites, I believe you

19     indicated that you sat in the van?

20             A.    As far as I can remember, yes, sir.

21             Q.    All right.  And the actual cleanup was

22     going -- let's use the Fifth Street viaduct for an

23     example -- the actual clean up is occurring at some

24     location away from the van; is that correct?

25             A.    Yes, sir.

1        Q.   And can you give us an estimate about

2    how far away from the van this was happening?

3        A.   10, 12, 15 feet.

4        Q.   Did you have any conversations with the

5    police officer during the cleanup taking place?

6        A.   Not that I recollect.

7        Q.   Were you ever able to observe any

8    conversations between the police officer and the

9    probationers?

10       A.   He would give them the directive.  The

11   police officer would give them directive on what

12   needs to be done at the locations.

13       Q.   All right.  Were you ever -- strike

14   that.  When the cleanup was finished, what

15   happened?

16       A.   If it was the end of the day, we would

17   bring the probationers back to the Justice Center

18   and drop them off.

19       Q.   Did the police officer stay at the

20   location when you were done?

21       A.   I don't remember.

22       Q.   All right.  Do you have any

23   recollection of whether any of your probationers

24   would have brought items of value to the police

25   officer?

1           A.   No, sir, I don't.

2           Q.   Okay.  Were you present and did you

3     listen to instructions being given the probationers

4     by the police officers?

5           A.   I was present, but not always

6     listening.

7                     MR. STEVENSON:  All right.

8     Nothing else.

9                   REDIRECT EXAMINATION

10    BY MR. GANULIN:

11          Q.   One follow-up.  You were sitting in a

12    van you said 12, 15 feet away from where the clean

13    up was occurring.  Were the windows rolled down in

14    your van in October?

15          A.   I don't remember.  I would probably

16    have them down winter, spring, summer, or fall.

17          Q.   But as you're testifying today, do you

18    specifically remember Police Officer Branigan

19    giving verbal orders to probationers?

20          A.   At every site they would have to give

21    them some sort of order, the policeman.

22          Q.   Do you remember how long the cleanup

23    took at that --

24          A.   Absolutely not.

25          Q.   But your testimony today, you can

1    remember now, do you remember what Police Officer

2    Branigan said?

3              A.   No, sir, I told you that.

4              Q.   But you observed him speaking to the

5    probationers?

6              A.   Yes.  They would have to have some sort

7    of directive on what to do by the policeman.

8              Q.   Are you saying that perhaps he spoke to

9    them once?

10             A.   I don't remember.

11             Q.   You don't know how many times he spoke

12   to them?

13             A.   Not at all.

14             Q.   Are you basically assuming he spoke to

15   them at least once?

16             A.   Yes.  He would have to give them a

17   directive to do -- I always tell the probationers

18   to do what the policeman tells them.

19             Q.   You directed them to go to the

20   policeman --

21             A.   Usually we follow the policeman to the

22   site and they would follow the directive of the

23   police officer.

24             Q.   And do you recall specifically that's

25   what occurred for this site beneath the Fifth

1    Street viaduct west of Central in October of 2001.

2              A.   Do I specifically?  No.

3              Q.   Okay.  That's fine.  I thought that's

4    what you were responding to Mr. Stevenson about.

5    That's fine.  Nothing else.

6                      RECROSS EXAMINATION

7    BY MR. FELSON:

8              Q.   I have one more item to ask here which

9    we haven't really discussed.  While these cleanups

10   were taking place, there was hauling away of what

11   was cleaned up, correct, in some fashion either

12   after or during?  What was the usual custom for

13   getting the stuff, taking the stuff away, or did

14   you have any connection with that?

15             A.   There would be a truck there, whether

16   it's pickup trucks, garbage trucks, and they would

17   bag things and haul it away, toss it into the

18   truck.

19             Q.   Would they be waiting while the cleanup

20   was taking place or called in afterwards, if you

21   recall?

22             A.   I don't remember.

23             Q.   On occasion would you see a sanitation

24   truck or a pickup truck while you were there?

25             A.   Yes, there would have been, to haul the

1    stuff away.

2              Q.   Theoretically they could wait until

3    it's done and call them when it's done later.  You

4    recall them being there?

5              A.   Yes.

6              Q.   You mentioned bags.  The probationers

7    were supplied with large garbage bags?

8              A.   Yes, sir.

9              Q.   And that's what they used to throw

10   things into?

11             A.   Yes, sir.

12             Q.   And they tie them up and put them down

13   or haul them to the truck?  Somebody would haul

14   them to the truck?

15             A.   The truck, yes.

16             Q.   Would that be the probationers?

17             A.   Yes.

18             Q.   And you saw that happen on occasion,

19   correct?

20             A.   Yes.

21                  MR. FELSON:  Now you never saw --

22   no, no, withdraw that.  Okay, nothing further.

23                  RECROSS EXAMINATION

24   BY MR. STEVENSON:

25             Q.   I have one follow-up.  Do your

1    probationers wear orange jumpsuits when they do

2    this work?

3            A.   Absolutely not.

4                 MR. STEVENSON:  All right.  Okay.

5    We're done.  We want signature.

6                 (Concluded at 10:01 a.m.)

7

8

9

10

11    _____
          JEFFREY A. SMITH

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T E

2

3

4    STATE OF OHIO
                    SS:
5    COUNTY OF MONTGOMERY

6

7            I, LISA K. KELLER, the undersigned, a
     Registered Reporter, Certified and Notary Public
8    within and for the State of Ohio, do hereby certify
     that before the giving of aforesaid deposition said
9    JEFFREY A. SMITH, was by me first duly sworn to
     state the truth, the whole truth, and nothing but
10   the truth; that the foregoing is the deposition
     given at said time and place by said JEFFREY A.
11   SMITH; that said deposition was taken in stenotypy
     by the court reporter and transcribed into
12   typewriting under her supervision; that said
     transcribed deposition was submitted to the witness
13   for his examination; the court reporter was neither
     a relative of nor attorney for any of the parties
14   to this case nor relative of nor employee for any
     of the counsel; neither the court reporter nor the
15   affiliated court reporting firm has a financial
     interest under a contract as defined in Civil Rule
16   28(D).

17           IN WITNESS WHEREOF, I hereunto set my
     hand and official seal of office this 16th day of
18   June, 2006.

19

20

21   _____
     LISA K. KELLER
     Notary Public, State of Ohio
22   My Commission Expires 11-7-08

23

24

25

1          PLEASE USE THIS ERRATA SHEET TO MAKE ANY
AND ALL CORRECTIONS, BY LISTING THE PAGE NUMBER,
2    LINE NUMBER AND THEN A BRIEF DESCRIPTION OF THE
ERROR.   PLEASE DO NOT MAKE ANY MARKS OR CORRECTIONS
3    ON THE TRANSCRIPT.   IF NEEDED USE THE BACK OF THIS
SHEET.   UPON COMPLETION PLEASE SIGN AND DATE THIS
4    SHEET AT THE BOTTOM.   THANK YOU.

5    _____

6    _____

7    _____

8    _____

9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    SIGNATURE:_____DATE:_____