IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

```
------------------------------------
                                    :
GERALD CASH, et al.,                :
                                    :
        Plaintiffs,                 :
                                    :
    vs.                             :       CASE NO.
                                    :       C101753
HAMILTON COUNTY DEPT. OF            :
ADULT PROBATION, et al.,            :
                                    :
        Defendants.                 :
                                    :
------------------------------------
```

Deposition of: TIMOTHY A. SHANNON

Taken:          By the Plaintiffs
                Pursuant to Agreement

Date:           July 14, 2006

Time:           Commencing at 11:09 a.m.

Place:          Hamilton County
                  Prosecutor's Office
                Suite 4000
                230 East Ninth Street
                Cincinnati, Ohio  45202

Before:         Debra J. Henderson, RPR
                Notary Public - State of Ohio

2

```
1    APPEARANCES:

2
        On behalf of the plaintiffs:
3
            Stephen R. Felson, Esq.
4           Suite 1401
            617 Vine Street
5           Cincinnati, Ohio  45202

6
        On behalf of the defendant Hamilton County
7         Department of Adult Probation:

8           David T. Stevenson, Esq.
                 of
9           Office of Hamilton County
              Prosecuting Attorney
10          Suite 4000
            230 East Ninth Street
11          Cincinnati, Ohio  45202

12
        On behalf of the defendant City of Cincinnati:
13
            Richard Ganulin, Esq.
14               of
            City of Cincinnati Law Department
15          Room 214
            801 Plum Street
16          Cincinnati, Ohio  45202

17
18                      - - -

19

20

21

22

23

24

25
```

3

1                          I N D E X

2

TIMOTHY A. SHANNON                                    PAGE

3

    Cross-Examination by Mr. Felson              4
4   Cross-Examination by Mr. Ganulin             30
    Examination by Mr. Stevenson                 33

5

6                      (No exhibits.)

7                          - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**© Ace-Merit, LLC  2006 / (513) 241-3200**
**30 Garfield Place, Suite 620   Cincinnati, Ohio  45202**

```
 1                  TIMOTHY A. SHANNON
 2   of lawful age, a witness herein, being first duly
 3   sworn as hereinafter certified, was examined and
 4   deposed as follows:
 5                  CROSS-EXAMINATION
 6   BY MR. FELSON:
 7        Q.   State your full name, please, for the
 8   record.
 9        A.   Timothy Adam Shannon, S-h-a-n-n-o-n.
10        Q.   Mr. Shannon, my name is Steve Felson.  I'm
11   the attorney for the plaintiffs here.  And we've had
12   a number of these depositions, as you know.  Have you
13   been deposed before?
14        A.   Have I been deposed in this case?
15        Q.   Any case.
16        A.   Any case?  Yes, I have been.  Yes.
17        Q.   Deposed a lot?
18        A.   Uh-huh, yeah.
19        Q.   What kind of cases, ordinarily?
20        A.   Oh, in some cases, criminal, a few civil.
21        Q.   What kind of civil cases?
22        A.   I'm trying to remember now.  The last one
23   I had was civil, and now I'm blanking as to what the
24   fact pattern was.  I can't remember.
25        Q.   Was Mr. Stevenson there?
```

1      A.    No.

2      Q.    Why don't you run down briefly your work

3   history, starting with before you came to work for

4   the county and then the various places you've worked?

5      A.    Well, I graduated from Wabash College in

6   1973 with a bachelor's in history.  I worked for

7   about a year in the credit department for Procter &

8   Gamble collecting past due accounts from deadbeat

9   grocery stores in New York City.

10          And then I left there and worked about

11   eight months with First National Bank -- well, what

12   was then First National Bank.  And then the program I

13   was involved in was dissolved by the bank, and in my

14   search for employment, stumbled across being a

15   probation officer for the Hamilton County Court of

16   Common Pleas.  And I started that career on January

17   25th, 1975.

18          And then I served as a probation officer

19   until about 1982 and became a specialist in handling

20   cases that were coming in from outside of the

21   jurisdiction.  And in 1985 I was promoted to the rank

22   of unit supervisor.

23      Q.    What's it called again?

24      A.    Unit supervisor.  And I had a crew of six

25   officers under my supervision and then became the

1    assistant chief probation officer in August of 1988,

2    and that is my current position.

3        Q.    Who is the chief?

4        A.    Right now it's Mr. Michael L. Walton, who

5    serves as the chief probation officer and also as the

6    Hamilton County Court Administrator.

7        Q.    Now, why don't you just describe for me,

8    generally, your experience with -- I'm going to use

9    this term that we've been trying to use together

10   here, and to avoid confusion, "homeless sweeps."

11   Does that mean anything to you?

12           Cleanup -- let me put it this way.

13   Cleanup -- cleaning up sites where people sleep

14   overnight.

15       A.    Uh-huh.

16       Q.    Okay.  You have some experience with that

17   or you know about it?  I don't say that you cleaned

18   them up.  I mean that you have supervised or some

19   people under you have had some experience with that.

20       A.    Well, I noticed that is the term being

21   used in the course of this case.

22       Q.    Have you reviewed some of the documents in

23   this case?

24       A.    Yeah, I read the -- counsel shared with me

25   a page from the Sixth Circuit.

1      Q.   So you understand that, at least, the

2   plaintiffs' claim is that they slept at certain sites

3   and left stuff there and that somebody came and took

4   their stuff and threw it away, just to make it -- do

5   it very briefly?

6      A.   Yeah, that's my understanding of the basis

7   of the case.

8      Q.   We've been trying to use the right term.

9   I'm not sure I have it right here, and my opposing

10  counsel, I'm sure, will correct me.  But I have in

11  quotes here, "cleanup of sites where people sleep

12  overnight."

13          MR. FELSON:  Is that more or less -- you

14       guys agreed that's what we're talking about in

15       this case?  We kicked this around about five

16       minutes one time.

17          MR. GANULIN:  You want to go off the

18       record?

19          MR. FELSON:  Yeah.  Let's go off.  Yeah.

20          (Off the record.)

21          MR. FELSON:  Back on.

22  BY MR. FELSON:

23      Q.   In your experience as a county employee,

24  did you ever hear of cases where county probationers

25  cleaned up sites around the city that -- for example,

1    under the Fifth and Sixth Street bridges, which is
2    what we're talking about now?
3         A.   We provided, being the probation
4    department, through the community service program a
5    crew chief and probationers to sites through the
6    community service, through the authority of the City
7    of Cincinnati, and would go to places where the city
8    had stuff to abate, and they would point to it and
9    say, clean that up.  And that's what we did.
10        Q.   Did you also do those for ODOT?
11        A.   Yes.
12        Q.   And those were -- ODOT would initiate
13   those?
14        A.   I don't know of -- yes, they would.  ODOT
15   will send us to places where there is litter and
16   stuff to abate.  So it's the same thing.  They will
17   send us to a place that is contaminated or littered,
18   and we clean it up.  And that's my direction.
19        Q.   Okay.  And my assumption is correct that
20   ODOT would send you to places that are under its
21   authority and the city would send you to places that
22   are under its authority?
23        A.   Highways and byways through their
24   jurisdiction or under their maintenance, yeah.
25        Q.   Now, you used the words "crew chief."  And

```
 1    in some of these depositions I heard the term "field
 2    supervisor."
 3          A.   It's interchangeable.  We call them crew
 4    chiefs.  I think the formal term on the job
 5    description is field supervisor.
 6               MR. STEVENSON:  Just keep in mind you have
 7          to answer out loud, and you have to use yes or
 8          no and not uh-huh and not uh-uh.
 9               THE WITNESS:  Okay.
10               MR. STEVENSON:  You did that at the start
11          of his questions, so just a reminder.
12    BY MR. FELSON:
13          Q.   Now, during what period that you describe
14    here from, oh, back in the '80s, did you have either,
15    let's say, crew chiefs under you who took
16    probationers out on cleanup missions, let's call it,
17    or cleanup work?
18          A.   Can you restate the question?
19          Q.   Yeah.  During some of this period -- the
20    reason you're in here is because a number of people
21    mentioned that their boss was Mr. Shannon.
22               Those people, a number of those described
23    taking crews out for cleanup purposes.
24          A.   Right.
25          Q.   Do you recall -- so you were -- supervised
```

1  some of those field supervisors or crew chiefs, you

2  were their boss, correct?

3      A.  At the time that I understand this case

4  originated, I would not have been the assistant chief

5  in charge of the community service program.

6      Q.  And that would have been, instead,

7  Mr. Browning?

8      A.  Mr. Browning was the program director or

9  the supervisor.  He would have reported to the

10  assistant chief in charge of the municipal court.

11          I'm trying to remember here now.  At some

12  point within the last five years, or thereabouts, the

13  superintendents of the program changed from the

14  municipal court to the court of common pleas.

15          So at the time this situation was ongoing,

16  it was a municipal court program and would have been

17  the municipal court chief.

18      Q.  We're talking October of 2001?

19      A.  Uh-huh.

20      Q.  Okay.  And it changed some time after

21  that.  Would that be shortly after --

22      A.  Right.  I'm thinking this -- probably

23  2002.

24      Q.  Okay.  Now, there was some testimony that

25  as of November of 2001 you instructed field

1    supervisors, don't do any more cleanup on homeless

2    sites.  Do you recall something like that?

3        A.    I remember at the initiation of this case

4    or shortly thereafter, upon advice from the Hamilton

5    County prosecuting attorney's office, we don't touch

6    homeless sites.

7        Q.    Where did you get your instruction from to

8    pass on?

9        A.    From the Hamilton County prosecuting

10   attorney's office.

11       Q.    Would that be Mr. Stevenson?

12       A.    He was one of the voices that went in my

13   ear, yes.

14       Q.    Do you recall any other voices that went

15   in your ear?

16       A.    I believe there was a written opinion that

17   came down, a memorandum.

18       Q.    So somewhere there was a memorandum

19   concerning cleanup of homeless sites that you recall?

20       A.    Yeah, I remember seeing something in

21   writing.  I'm trying to remember who the office was.

22       Q.    Before that, was that just about when you

23   came into the position of supervising some of this

24   stuff?

25       A.    I can't recall.  I would have to go back

```
 1   and take a look at the calendar to be absolutely
 2   sure.
 3       Q.   Okay.  Did you ever see any other written
 4   instructions regarding cleanup work?
 5       A.   No.
 6       Q.   Did you ever, yourself, pass on memoranda
 7   to field supervisors concerning cleanup of sites
 8   using probationers?
 9            MR. STEVENSON:  What time frame?
10   BY MR. FELSON:
11       Q.   Any time frame.
12       A.   Memoranda being something written?
13       Q.   Something on a piece of paper.
14       A.   No.
15       Q.   So anything that you had -- well, did you
16   ever give any oral instructions to anybody about
17   cleaning up --
18       A.   Oh, yeah.
19       Q.   -- sites?
20       A.   Yeah.
21       Q.   What kind of instructions would you have
22   been called upon to give?  I take this to be after
23   2001?
24       A.   Uh-huh.
25       Q.   What kind of instructions would be typical
```

1    that you would have to give?

2        A.    If it's a homeless site, don't touch it.

3        Q.    If it's a homeless site, don't touch it.

4    You recall passing that on orally.  Any other items

5    that you might have passed on about cleaning up other

6    sites?

7        A.    No.  If it appears to be a homeless site,

8    don't touch it.

9        Q.    Any instructions not involving homeless

10   sites, like if you go to a certain place, don't go

11   away -- don't go up -- there was some talk about when

12   it gets to be slanted too much, it's dangerous.

13       A.    Okay.  We tell field supervisors or crew

14   chiefs, if you feel that the environment that is

15   presented to you is unsafe or that it is a risk for

16   you to work in that area, you do not put yourself or

17   your crew at risk.

18       Q.    Okay.

19       A.    And if there's -- don't go there.

20       Q.    And with those instructions, then, they

21   would be on the site and it would be their

22   discretion?

23       A.    Indeed.

24       Q.    And it didn't get as far as saying, well,

25   if it's a grade more than X percent, don't do it?

1      A.   No, we've never gone down to that kind of

2   precision.  It's based solely upon the judgment of

3   the crew supervisor that if the area is unsafe for

4   any reason.  Again, if you consider it unsafe, don't

5   go there.

6      Q.   Now, before you took over, and it would be

7   late in '01, possibly '02, who was your direct

8   predecessor?

9      A.   My direct predecessor?

10      Q.   Before you -- yes, before November of

11   2001.

12      A.   Oh, you mean that would have had the

13   community service program?

14      Q.   Yeah.

15      A.   It would have been the other assistant

16   chief.  Possibly some information on the construction

17   of the department.  The department serves -- is

18   controlled by the courts and handles matters from the

19   Hamilton County Court of Common Pleas and the

20   Hamilton County Municipal Court.

21      The municipal court has its assistant

22   chief.  And at that time I believe it was

23   Mr. Larry Muse, was the municipal --

24      Q.   How do you spell that?

25      A.   M-u-s-e.

```
 1          Q.   And that would be in late 2001?

 2          A.   Uh-huh.

 3          Q.   Okay.

 4          A.   I don't want to say.  I'm not -- let's

 5     see.  I think Larry was still there.  It may have

 6     been Mr. Campbell.  Larry retired and was on medical

 7     leave prior to that.

 8               Again, I would have to go back and look at

 9     some calendars, but the -- and then there was myself

10     serving the court of common pleas.

11               But we both -- both courts feed clients

12     into the community service program as part of their

13     rules and conditions and probation of community

14     control.

15          Q.   When you say "clients," you mean people

16     who have been sentenced to this?

17          A.   Uh-huh.

18               MR. STEVENSON:  Probationers.

19          Q.   Probationers --

20          A.   Yes.

21          Q.   -- is the word we have been using.  Is

22     that the accurate word?

23          A.   Well, not all of them are on probation.

24     Some of them are on stay of pays that are not on

25     probation, they are under court order to come in and
```

1    abate a financial obligation by means of community

2    service.

3         Q.   Technically, anybody ordered to do

4    community service -- let me finish -- for whatever

5    reason, correct?

6         A.   By some judge, either municipal court or

7    common pleas.

8         Q.   All right.  I want to get the terms right.

9    Now -- so I still don't know who would -- before you

10   came into this job on -- in late 2001, there was

11   still, as we know, field supervisors going out and

12   doing cleanup.

13        A.   Right.

14        Q.   Who were they reporting to?  I should say,

15   whom were they reporting to?

16        A.   Mr. Browning directly.

17        Q.   Mr. Browning.  Okay.

18        A.   Uh-huh.

19        Q.   And whether it was through municipal or

20   through common pleas, there still were probationers

21   out there and they were reporting to somebody and it

22   was him?

23        A.   (Nodding head.)

24        Q.   Okay.

25        A.   Yep.

1    Q.   Now, do you recall a sort of division of

2  labor among field supervisors, some people would

3  never clean up under the bridges and along the

4  highways and some always did that, or was it random,

5  they were sent out in random nature?

6    A.    Well, we have contracts with ODOT, the

7  City of Cincinnati, and Hamilton County to provide

8  litter abatement along highways.

9         With the city we were also doing some

10  graffiti abatement and cleanup along what used to be

11  the skywalk.

12         Those contracts would underwrite the cost

13  of the crew supervisor and the other incidental costs

14  of providing that crew; the gas for the van, that

15  stuff.

16         And there were certain supervisors who

17  were assigned to those contracts.  That was their

18  primary responsibility, was to service those

19  contracts.

20         Any crew supervisor could end up doing

21  that if the crew supervisor was -- the primary

22  supervisor, crew supervisor, was absent that day, we

23  would take another crew supervisor and put him in to

24  service that contract, because the contract required

25  so many hours of labor within a five-day period had

1    to be delivered.

2             So to maintain compliance with the

3    contract, we would stick somebody in there if the

4    other guy was absent.

5        Q.   So you're saying there were people

6    assigned but there was some flexibility involved?

7        A.   Uh-huh.

8        Q.   Do you know anything about who would

9    accompany the crew chief and his -- what we're going

10   to call them, his crew, let's say, to these sites?

11   Cincinnati police officer, ODOT official, nobody?

12   What knowledge do you have about that?

13       A.   From my understanding, like with ODOT, the

14   ODOT crew will go to the ODOT headquarters and check

15   in that morning, and the ODOT people will give them

16   what stretch of highway needs to be abated that day,

17   and then they go there.

18             The county crew pretty much moves around

19   the county and has this parapetic path that they

20   follow along the highway.  It was my understanding

21   with the city that they had a circuit that they ran

22   through the downtown area.  And then, if there were

23   particular spots that need attention, they would be

24   contacted by a representative of the city.  Most

25   often that representative was from what we call

1  sanitation.  It's now division of neighborhood

2  operations or something like that.

3       Q.   Sanitation meaning, not the Cincinnati

4  Police Department, or is that part of Cincinnati

5  Police Department?

6       A.   Well, no.  Now, until this situation, I

7  never knew we were being directed by officers of the

8  Cincinnati police division.

9       Q.   There has been some testimony to that.

10 You understand that?

11      A.   Right.

12      Q.   Okay.  That --

13      A.   It was until that testimony that I ever

14 knew we were responding to what police officers

15 wanted us to do.

16           My prior experience had been that we would

17 work with sanitation, and they would come in and say,

18 we have graffiti here, or after some function on

19 Fountain Square, you know, the place had litter, and

20 we would go in and clean it up.  They would tell us

21 where -- we called them hot spots, where they wanted

22 us to go.  Or they would get community complaints,

23 this lot is foul, come clean it up, and they would

24 send us there, and we would do it.

25      Q.   And that would be the sanitation division

1  or department of the City of Cincinnati?

2       A.   Uh-huh.

3       Q.   Did they contact you directly or who?

4       A.   In some cases they would, not always.  A

5  lot of times they would -- they knew where the crew

6  was, and they would run -- the sanitation supervisor

7  would be out, would find our crew and say, you know,

8  this place needs work, and our crew would go there.

9       Q.   So the system was flexible enough, they'd

10 finish one place, somebody would tell them to go

11 somewhere else, they knew who it was, and they would

12 go do it?

13      A.   Uh-huh.

14      Q.   Okay.  So you don't have any personal

15 experience, either before this incident took place or

16 after, of an ODOT -- of where the ODOT truck was,

17 let's say, when probationers were cleaning up an ODOT

18 site?

19      A.   No.

20      Q.   You never were present at one of these

21 cleanups?

22      A.   No.

23      Q.   I'm not just talking about homeless, I'm

24 talking about any cleanup.

25      A.   No.

```
 1         Q.   Same true for cleanup of city property?
 2         A.   No, I have never been present on any of
 3    those operations.
 4         Q.   Did you ever discuss with field
 5    supervisors any issues involving a police officer's
 6    presence on the spot?
 7         A.   Not until the initiation of this matter.
 8         Q.   And what happened then?
 9         A.   When it came up, and it was told to me
10    that an officer of the Cincinnati police division had
11    directed a crew to go to this location and abate
12    this -- this area pursuant to their directive.
13         Q.   And that you heard through -- who told you
14    that?
15         A.   I think it was Jeff Smith, the crew chief,
16    came back, when all of this started, and, you know,
17    how did this happen?  And he said, well, the police
18    told us to do it.
19         Q.   Did you have any responsibilities
20    regarding -- strike that.
21              When you say Jeff Smith told you, this
22    would just be -- this wasn't in the chain of command,
23    was it, this was just you and he talking, or was
24    there some actual meeting that was held?
25         A.   I called him in when we started
```

```
 1    understanding that this was going -- this resulted in
 2    litigation.
 3         Q.   You were already in charge -- this would
 4    be after -- obviously, after the fall of '01?
 5         A.   Again, I'm trying to recall.  Somehow or
 6    another the responsibility for the response to this
 7    fell to me.  I don't know if Mr. Muse was absent by
 8    that point or -- but it came to my desk that there
 9    was a problem as a result of this particular
10    abatement operation.
11              And I think it was the conversation from
12    Mr. Browning with me, well, okay, what happened here.
13    And Smith told us that he had been directed by the
14    police to abate this location, and they did that.
15         Q.   Did he say whether there was an officer
16    present?
17         A.   No.  He just said they did it at the
18    direction of the police.
19         Q.   And did he go into detail about where his
20    car was or his van was?
21         A.   No.
22         Q.   Okay.  Was it at that point,
23    approximately, when the decision was made not to do
24    any more homeless site cleanups?
25         A.   It was -- actually, the directive came
```

```
 1    down, if my recollection of events is correct, the --
 2    when I was informed that litigation was at hand, the
 3    instruction of don't-touch-any-more-homeless-sites
 4    was companion with that advisement.
 5         Q.   And I'm not quite sure I understand.
 6         A.   I didn't know there was litigation pending
 7    until I got a call, and I can't remember if it was
 8    Mr. Stevenson or -- but it was, there's litigation
 9    here, don't touch any more homeless sites.
10         Q.   Okay.
11         A.   And at that point I contacted what would
12    have been, then, each and every of our cadre of crew
13    supervisors and said, don't touch the homeless sites.
14         Q.   And did you hear anything from any of them
15    about any prior cleanup of homeless sites?
16         A.   No.
17         Q.   The only thing you heard that has anything
18    to do with the cleanup that we're talking about is
19    from Jeff Smith?
20         A.   Uh-huh.
21              MR. STEVENSON:  That would be yes?
22         A.   Yes.  I'm sorry.
23              MR. FELSON:  I knew it was a yes, but she
24         might not.  Later we might not know.
25              THE WITNESS:  Yes.
```

BY MR. FELSON:

    Q.   Okay.  These general cleanup matters that we've been talking about, and again, I understand that -- let's just -- talking general.

        The probationers and whoever else had been ordered out there, community service people, let's call them, personnel, are out there cleaning up, and there's a crew chief that we've heard testimony about.

    A.   Right.

    Q.   There, presumably, is also -- there's an involvement of bags to put the stuff in, correct?

    A.   Uh-huh.  Yes.

    Q.   That's going to go with any cleanup; isn't that correct?

    A.   Yes.

    Q.   Who brought the bags?

    A.   Who brought the bags?

    Q.   Somebody had to be responsible for the actual nuts and bolts of this operation.  You don't clean it up and leave it there.

        MR. STEVENSON:  I'm going to object.  Tim, answer if you know.

    A.   I don't know.

BY MR. FELSON:

1      Q.   Best of your knowledge.  If you don't
2  know, you don't know.
3      A.   I don't know.  I know bags were supplied.
4  I know -- I don't know where they came from.
5      Q.   As far as you know, crew chiefs didn't go
6  into their office next door or the broom closet and
7  take a bunch of bags?
8      A.   No, we have no supply of bags.  I can tell
9  you that.
10     Q.   Okay, that you know.  That's good.  So
11  that came from somewhere, not from your department?
12     A.   We have no storage of bags.
13     Q.   Do you have any personal knowledge of,
14  let's say that you witnessed, in any cleanup of any
15  kind of personal property being segregated from
16  trash?
17     A.   No.
18     Q.   Now, do you know anything about crew
19  supervisors -- or crew chiefs, I'm sorry, doing any
20  segregation of that kind or ordering it to be done?
21     A.   No.
22         MR. STEVENSON:  Objection.  It's beyond
23     his personal knowledge.
24  BY MR. FELSON:
25     Q.   You can answer.

```
1              MR. STEVENSON:  He did answer.

2         A.   No.

3    BY MR. FELSON:

4         Q.   The answer was no.  Okay.  Did anybody

5    ever mention the issue -- besides this lawsuit, I

6    understand you know what's in the lawsuit.

7              Besides the lawsuit, did anybody ever

8    mention what we do if there's something that looks

9    like it's not trash?  Anybody ever ask you?

10        A.   Well, I've received -- we find all manner

11   of stuff along the highway.  I've received calls when

12   they find guns.  What -- we found a gun, what do we

13   do?  Call the cops.  We found stuff that looks to be

14   like a bag full of money, what do we do?  Call the

15   cops.  We found a dead body, what do we do?  Call the

16   cops.

17        Q.   You don't put the money in the trash --

18        A.   No.

19        Q.   -- and then compact it?

20        A.   No.  We call the cops.

21        Q.   Ever been requested by attorneys from the

22   prosecutor's office to just bring it over here?

23        A.   No.

24             MR. STEVENSON:  I assume that's a joke.

25             MR. FELSON:  It could happen, it could
```

```
 1        happen.  In New York City, it would happen.
 2        A.   Yeah.  They find wallets, they find all --
 3   there's a cornucopia of stuff.  And I would get calls
 4   that we have found this, what do we do with it?  Now,
 5   as far as segregating --
 6        Q.   Well, let me stop you a second.  You would
 7   get calls, and that would be from?
 8        A.   The crew chiefs.
 9        Q.   Crew chiefs.  So they wouldn't know what
10   to do with that without calling you each time?
11        A.   Sometimes they do, sometimes they don't.
12   Newer employees tend to be somewhat more cautious.
13   Older guys, no.
14        Q.   So I take it then from that, I'm
15   inferring, tell me if I'm right, written instructions
16   as to what to do with personal property when you find
17   it -- well, when your probationers find it, those
18   didn't exist, correct?
19        A.   Would you restate the question?
20        Q.   Okay.  I'm implying, and I want you to
21   confirm this or reject it, from the fact that people
22   call you and ask you what to do with a wallet or with
23   money --
24        A.   Uh-huh.
25        Q.   -- that they didn't have a memorandum or a
```

1    manual or some written instructions saying what to do

2    with personal property?

3        A.    No.  The instruction is that if you don't

4    know, ask.

5        Q.    Okay.

6        A.    If you have a question, ask.

7        Q.    Now, when you say the instruction, that's

8    a general, oral instruction?

9        A.    Yes.

10       Q.    There wasn't much in the way of written

11   instructions to these crew chiefs, correct?

12       A.    That's correct.

13       Q.    In fact, so far I haven't heard of any

14   written instruction to crew chiefs?

15       A.    That's correct.

16       Q.    All right.  Now, besides this case, have

17   you ever talked with -- have you ever had a

18   discussion with anybody concerning cleanups under

19   bridges, specifically under bridges where homeless

20   people might sleep?

21             I understand you had conversations here

22   with Jeff Smith, but --

23       A.    Beyond the scope of this case, no.

24       Q.    So besides Jeff Smith who you had a talk

25   with about the cleanup that's possibly what we're

```
 1    talking about here, you don't recall any other just
 2    even casual conversations?
 3         A.   No.  Again, the instructions were, you
 4    don't touch it.
 5         Q.   The instructions from your time on --
 6         A.   Uh-huh.
 7         Q.   -- is don't do it?
 8         A.   Right.
 9         Q.   But you know it's also possible that -- I
10    mean, if you're in a long term -- some of these
11    people have been around for a long time, they might
12    have talked about anything.
13              You don't recall anybody saying, gee, one
14    time we went out, and these guys were sleeping there
15    and they had a small gold bullion?
16         A.   I have not had any conversation like that.
17              MR. FELSON:  And the prosecutor said,
18         bring it over, okay.  Okay.
19    BY MR. FELSON:
20         Q.   And this is really a -- it's similar to
21    the last question, but it's slightly more detailed.
22              Have you ever heard of personal property
23    from homeless sites being taken to the police
24    property room of any kind?
25         A.   No.
```

```
 1        Q.   Do you have any knowledge -- and I
 2   understand, again, from your time, no homeless
 3   sweeps, but homeless sweeps have taken place in the
 4   past, we've had quite a bit of testimony, so you
 5   might have heard something.  That's really what I
 6   want here -- hold on.
 7             Any knowledge about giving notice before a
 8   homeless sweep takes place, putting up a sign or
 9   something or taping something up?
10        A.   No.
11             MR. FELSON:  That's it.
12             MR. GANULIN:  I just have a few questions.
13                    CROSS-EXAMINATION
14   BY MR. GANULIN:
15        Q.   I'm Rick Ganulin, and I'm with the City of
16   Cincinnati.  Jeff Smith, I think you said, was a crew
17   chief?
18        A.   Uh-huh.
19        Q.   And your crew chiefs manage their own
20   probationers?
21        A.   Manage might be a little broad, but they
22   supervise them.
23        Q.   They still supervise them at the different
24   sites that were being cleaned up.  I think you called
25   it litter abatement?
```

1      A.    Uh-huh.  Yes.

2      Q.    Yes?

3      A.    Yes.

4      Q.    And is -- are the allegations in this

5  lawsuit the only instance that you're aware of where

6  Mr. Smith says he did not supervise his own

7  probationers but he let a Cincinnati police officer

8  direct them?

9      A.    Could you ask that question again?

10     Q.    As I understood what you just said

11  before --

12     A.    Yes.

13     Q.    -- Mr. Smith supervised his own

14  probationers during the litter abatement cleanup?

15     A.    Right.

16     Q.    But I thought I also heard you say that

17  insofar as the allegations in this lawsuit are

18  concerned, that Mr. Smith told you that a Cincinnati

19  police officer directed the probationers.  Is that

20  what you testified before?

21     A.    No.  It was my testimony that the police

22  officer directed the crew to the site to abate.  Now,

23  I have no knowledge of the -- of a police officer

24  having assumed supervision of the crew.

25     Q.    The normal practice would be for Mr. Smith

```
1    to supervise his own crew --
2         A.   Right.
3         Q.   -- during the abatement activities?
4         A.   That's correct.
5         Q.   And, also, I just want to clarify the
6    record in response to some questions from Mr. Felson.
7              I think you testified that you are not
8    aware whether personal property items were segregated
9    from trash, and you're not aware whether personal
10   property items were taken to the Cincinnati Police
11   Department property room; is that correct?
12        A.   That's correct.
13        Q.   You are not testifying that you know that
14   personal property was not segregated from trash?
15   That's a double negative.
16             You don't know whether personal property
17   was segregated from trash; is that correct?
18        A.   That's correct.  I know of no segregation.
19        Q.   And you don't know whether objects of
20   value were taken to the Cincinnati property room?
21        A.   I have no knowledge of that.
22        Q.   It could have been segregated, correct?
23        A.   Again, I don't know.  You know, under --
24   anything is possible.
25        Q.   You don't know if they were or were not?
```

1          A.    That's correct.

2          Q.    And you don't know if they were or were

3    not taken to the Cincinnati property room?

4          A.    That's correct.

5          Q.    And if I understand your responses to

6    Mr. Felson's questions, your own probationers were --

7    and crew chiefs were instructed to not throw away,

8    whether it was guns or cash or wallets, objects of

9    value as if they were trash?

10         A.    I don't believe that was the instruction.

11   If you find something out of the ordinary, then you

12   call and ask, what do I do with this.

13              I don't think it was ever balanced on

14   whether it appears to be personal property, whether

15   it's -- stuff that's out of the ordinary.

16         Q.    But your crew chiefs had discretion to

17   make that determination at the site of the abatement

18   activity?

19         A.    Right.  They would have the discretion

20   whether it was ordinary or not.

21              MR. GANULIN:  Nothing else.  Thank you.

22                      EXAMINATION

23   BY MR. STEVENSON:

24         Q.    Tim, Mr. Felson asked, at the tail end of

25   his questioning, whether or not you had heard of what

1    he referred to as homeless sweeps.  And he was fairly

2    vague on the time frame and some other stuff.

3              Since you have been in charge of the

4    community service crews, or actually in charge of the

5    community service since the department has put

6    community service under common pleas court, have you

7    ever gotten any calls from anyone regarding the

8    character of an area they've been asked to pick up?

9         A.   No.  I've heard words like eyesore, stuff

10   like that.

11        Q.   Have you gotten a call from anybody with

12   respect to property that you refused to pick up?

13        A.   No.

14             MR. GANULIN:  Ask that question

15        differently, because I understand what you're

16        asking, but it's not clear.

17             MR. FELSON:  Yeah.  And I didn't even

18        understand where you're going.

19   BY MR. STEVENSON:

20        Q.   Has anybody ever asked you to provide

21   workers to a site that you refused to go to because

22   it appeared to be a homeless site or your workers

23   said it appears to be a homeless site?

24        A.   No, I have never -- I've not ever received

25   a call requesting a cleanup of a homeless site.  Is

```
 1   that --
 2         Q.   No.  That's not my question.  Have you
 3   ever been asked to provide workers to go to a
 4   location where you refused to go to because it
 5   appeared to be a homeless site?
 6         A.   I have never received that kind of call.
 7              MR. STEVENSON:  Can we go off the record
 8         for a minute?
 9              (Off the record.)
10              MR. STEVENSON:  Back on the record.
11   BY MR. STEVENSON:
12         Q.   Since community service has been placed
13   under your control --
14         A.   Right.
15         Q.   -- has any entity or person or agency
16   inquired of the probation department about a
17   particular -- a cleanup of a particular site that the
18   probation office did not clean up?
19         A.   I'm still having trouble processing the
20   question.  I'm sorry.
21              I've received instructions not to clean up
22   homeless sites.
23         Q.   Have you ever received inquires about
24   cleaning up particular sites?
25         A.   Relative to this litigation, yes.
```

```
 1         Q.   After this litigation was instituted, have
 2    you received inquires about cleaning up particular
 3    sites?
 4         A.   Relative to this litigation?
 5         Q.   Not relative to this litigation.
 6         A.   Okay.  Any other --
 7         Q.   Any other site.
 8         A.   No one -- no one has ever called me and
 9    said, you know --
10         Q.   No one has ever called you and said, we've
11    got a mess over here, come clean it up?
12         A.   Oh, we get calls, yeah, we've got a mess
13    over here.
14         Q.   That's the question.
15         A.   Okay.  Yes.  I'm sorry.
16         Q.   All right.
17         A.   Maybe I keep --
18         Q.   You're thinking too much.
19         A.   Okay.  Yes.
20         Q.   Answer the question.  Have you received
21    such inquiries?
22         A.   Yes.
23         Q.   All right.  And what has been your
24    response to those inquires?
25         A.   We send a crew to the site, and if it
```

1    appears to be a homeless site, we don't touch it.  If

2    it appears to be a site we can abate, we proceed.

3         Q.   All right.  Have you had conversations

4    with other entities about the sites that you don't

5    touch?

6         A.   Yes.

7         Q.   All right.  Could you describe those for

8    us, please?

9         A.   We have had conversations with ODOT, with

10   the -- with the city and the county that if, in the

11   opinion of the crew chief or the crew supervisor,

12   that this appears to be a homeless site, we will not

13   touch it.

14        Q.   All right.  Who specifically at ODOT did

15   you talk to, do you remember?

16        A.   The one young woman's name is Sherry.  I

17   think her last name is Green, but I know her first

18   name is Sherry.  And a gentleman by the name of Abell

19   Fuller.

20        Q.   Do you remember who you talked to at the

21   City of Cincinnati?

22        A.   It was -- no, not specifically by name.

23   It was someone from -- who was, at the point, the

24   director of neighborhood operations.

25             MR. STEVENSON:  Okay.  All right.  I don't

1      have anything further.

2              MR. FELSON:  No, nothing from me.

3

4

5                          (Signature waived.)
                   ------------------------------
6                          TIMOTHY A. SHANNON

7

8

9                   - - -

10        DEPOSITION CONCLUDED AT 11:51 A.M.

11                  - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              C E R T I F I C A T E
2    STATE OF OHIO      :
                        :      SS
3    COUNTY OF CLERMONT :
4         I, Debra J. Henderson, RPR, the undersigned, a
5    duly qualified and commissioned notary public within
6    and for the State of Ohio, do hereby certify that
7    before the giving of his aforesaid deposition,
8    TIMOTHY A. SHANNON was by me first duly sworn to
9    depose the truth, the whole truth and nothing but the
10   truth; that the foregoing is the deposition given at
11   said time and place by TIMOTHY A. SHANNON; that said
12   deposition was taken in all respects pursuant to
13   stipulations of counsel; that I am neither a relative
14   of nor employee of any of the parties or their
15   counsel, and have no interest whatever in the result
16   of the action; that I am not, nor is the court
17   reporting firm with which I am affiliated, under a
18   contract as defined in Civil Rule 28(D).
19        IN WITNESS WHEREOF, I hereunto set my hand and
20   official seal of office at Batavia, Ohio, this ____
21   day of _____, 2006.
22
23                            _____
     My commission expires:   Debra J. Henderson, RPR
24   May 8, 2010.             Notary Public - State of Ohio
25
```