IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

------------------------------------------------

GREGORY CASH AND CLARA CASH :
AND GREGORY B. WAHOFF AND   :
PHILLIP GARCIA AND ROCKY    :
WAYNE ADKISSON,             :
    Plaintiffs,             :
    -vs-                    :   C-1-01-753
HAMILTON COUNTY DEPARTMENT  :
OF ADULT PROBATION AND      :
MICHAEL WALTON AND CITY OF  :
CINCINNATI,                 :
    Defendants.             :

------------------------------------------------

        Deposition of RODERICK ELLIS, a Witness

herein, taken by the Defendants as upon direct

examination and pursuant to the Federal Rules of

Civil Procedure as to the time and place and

stipulations hereinafter set forth, at the offices

of Hamilton County Prosecutor's Office, 230 East

Ninth Street, Cincinnati, Ohio, at 10:19 a.m. on

Wednesday, June 7, 2006, before Lisa K. Keller, a

Registered Professional Reporter and Notary Public

within and for the State of Ohio.


        *   *   *   *   *   *

3ae5be03-23a3-41b4-9d23-db1ce3370ce4

1                    QUICK REFERENCE INDEX

2       WITNESS:  RODERICK ELLIS

3       APPEARANCES:   PAGE 3

4

5                          DX   CX   RDX   RCX

6       BY: MR. FELSON       -    4    -     -

7

8                          EXHIBITS

9            IDENTIFIED                      PAGE

10      PLF'S:        -                       -

11      PLF'S:        -                       -

12      PLF'S:        -                       -

13

14            INFORMATION REQUESTED

15

16            Not Applicable

17

18              *    *    *    *    *

19

20

21

22

23

24

25

3ae5be03-23a3-41b4-9d23-db1ce3370ce4

1    APPEARANCES:

2    ON BEHALF OF PLAINTIFFS

3         Mr. Stephen Felson
          Attorney at Law
4         CBLD Center
          Suite 1650
5         36 East Seventh Street
          Cincinnati, Ohio  45202
6

     ON BEHALF OF DEFENDANTS
7

          Mr. Rick Ganulin
8         Attorney at Law
          801 Plum Street
9         Cincinnati, Ohio  45202
10        Mr. David T. Stephenson
          Attorney at Law
11        Assistant Prosecuting Attorney
          230 East Ninth Street
12        Suite 4000
          Cincinnati, Ohio  45202
13

     ALSO PRESENT
14

          Ms. Amy Diers
15

16                *    *    *    *    *    *

17

18

19

20

21

22

23

24

25

3ae5be03-23a3-41b4-9d23-db1ce3370ce4

1    WHEREUPON:

2                         RODERICK ELLIS,

3    of lawful age, a witness herein, being first duly

4    sworn as hereinafter certified, testified as

5    follows:

6                         CROSS EXAMINATION

7    BY MR. FELSON:

8            Q.   Mr. Ellis, state your full name,

9    please.

10           A.   Roderick Ellis.

11           Q.   What's your current position with the

12   county?

13           A.   Probation officer.

14           Q.   Can you give me your complete work

15   history with the years after leaving school?  Where

16   did you go to school by the way?

17           A.   UC, University of Cincinnati.

18           Q.   Do you have a degree there?

19           A.   Yes.

20           Q.   And what was your first job after

21   that --

22           A.   After I --

23           Q.   -- or during.

24           A.   Well, when I was a student in school, I

25   was working at the county part time, Probation

Page 5

1    Department part time.  After I got my degree, then
2    I became a probation officer.
3              Q.  When was that?  What year?
4              A.  2001, somewhere in there, 2001 or 2002,
5    somewhere in there.
6              Q.  Now you haven't heard, but I'll tell
7    you what we're talking about here.  I'm sure you've
8    talked to your attorneys about this.  We are
9    talking about the cleanup of homeless sites.
10             A.  Right.
11             Q.  You understand that at least on some
12   occasions in the past adult probationers in
13   Hamilton County have been used for that task,
14   correct?
15             A.  Yeah, I recall that back then.
16             Q.  When you say back then, when are you
17   referring to?
18             A.  At the time the situation happened, I
19   believe, you know, I have a very vague memory of
20   it, but I believe it was a certain crew that was
21   probably out there picking up trash or something,
22   homeless, I don't remember exactly who the crew
23   members was that was doing that at that time.
24             Q.  And this would be back, you say, before
25   you were a probation officer?

Page 6

1          A.   It was before.

2          Q.   So what was your position before that,

3     before you became a probation officer?

4          A.   I was a field supervisor.  That's what

5     we did.  We took crews out and supervised them.

6          Q.   Is that the same position as Jeff Smith

7     who testified here before?

8          A.   Right.

9          Q.   So you did that sort of thing before

10    you became a probation officer?

11         A.   Exactly.

12         Q.   And did you go out with crews?

13         A.   Yes, I took a crew out.

14         Q.   You said a crew.  Did that only happen

15    one day?

16         A.   Well, I did it five days a week.

17         Q.   And how long did you do it?  How many

18    weeks or years or months?

19         A.   Well, I started out part time on the

20    weekends from, I guess from 1999.  I believe it was

21    from '99 until I became a probation officer, which

22    was probably 2002 maybe or something like that.

23         Q.   So you have a couple of years at least

24    experience in taking crews out for cleanups?

25         A.   Yes.

Page 7

1      Q.   And that would be adult probationers?

2      A.   Right.

3      Q.   And what color clothing did they wear?

4      A.   They would wear vests, like safety

5  vests.  There wasn't any specific color that they

6  would have to wear as far as clothes go.  They can

7  wear anything they like as long as it was

8  appropriate, but they would wear like safety vests,

9  either usually red or blue.

10     Q.   Now, how would you know where to take

11 these workers?

12     A.   Well, what happened is the day would

13 start out where we would go to the ODOT garage and

14 they would give us a specific location that they

15 want done that day.

16     Q.   And when you use the word location,

17 were these locations Ohio -- on Ohio property?

18     A.   Yes, the highways.

19     Q.   So as far as you know, you weren't --

20 ODOT was not giving you instructions to clean up on

21 city property?

22     A.   Exactly.  We do not do city --

23     Q.   Go ahead finish.

24     A.   As far as I know, we didn't do any city

25 properties, it's always been highway.

Page 8

1    Q.  Now, do you know about the contract

2    between ODOT and the county?

3    A.  Yeah.  I believe that there was a

4    contract.

5    Q.  That was mentioned here and there.

6    That's why -- you were working for ODOT?

7    A.  Yes.

8    Q.  I don't mean working for them as an

9    employee.  You were getting instructions from ODOT?

10    A.  Right.

11    Q.  Now, you would get instructions from

12    them concerning where to go?

13    A.  Right.

14    Q.  And would there be several sites to

15    clean up in the day?

16    A.  It could be just one or it could be

17    several, it depends.

18    Q.  Would these be sites adjacent to under

19    a state highway?

20    A.  Yes, it would be a highway, exit ramp,

21    on and off ramps.

22    Q.  Now, ever clean up under some of these

23    bridges?

24    A.  I would go past them, but I don't

25    believe I ever actually cleaned up underneath them

Page 9

1  or anything like that.

2       Q.  Did you ever, you and your crew we're

3  talking about, ever clean up at a homeless site?

4       A.  To be honest with you, I don't remember

5  if we ever cleaned up at a homeless site.  We've

6  done the highways, which you know, as you go along

7  the highways, there's, you know, the underpasses

8  and, you know, but as far as probably going all the

9  way up where they usually live at, I doubt it

10 seriously.  We just go on the very edge where the

11 grass is at behind the guard rails and we just keep

12 going.

13      Q.  Now, when you say all the way up, are

14 we talking about possibly up towards the concrete

15 ceiling there?

16      A.  Yes, up towards that way.  I don't let

17 my crew go up there because of safety issues, you

18 know, them going all the way up there and with it

19 being so slanted like that, I didn't want anyone to

20 fall or anything like that.  So I've never actually

21 sent them up there, you know.  I've always done the

22 edges, behind the guard rail, grass area where

23 trash is.

24      Q.  Did you ever see a site where you could

25 look up on the slant there and tell that people

Page 10

1  were living there?

2          A.  I've seen sites like that, but I've

3  also seen sites that's trashed, but sometimes you

4  can't tell if someone is living there or not.  You

5  see a lot of broken bottles, you see clothes, all

6  kinds of things.  I don't necessarily know if

7  someone is living up there or not.

8          Q.  But your testimony is that in the two

9  to three years that you took crews out, crews of

10 adult probationers, you never actually had the crew

11 clean up a site which you knew was a homeless site?

12         A.  To be honest, I don't even -- I don't

13 really know, to be honest.

14         Q.  You don't remember ever doing it?

15         A.  No, I don't ever remember really, I

16 guess, having someone clean up a homeless site if I

17 know it's a homeless site.  I mean --

18         Q.  Finish your sentence.  If you know it's

19 a homeless site, you wouldn't do it?  Is that what

20 you're saying?

21         A.  If I know it's a homeless site, for

22 example, if I would see people up there, then I

23 wouldn't have anyone go up there.  Again, because

24 of safety issues.

25         Q.  And you wouldn't go up?

Page 11

1        A.   No, I wouldn't go up there.

2        Q.   So you've never told people who were

3   living under a bridge or under an overpass or

4   something, "We're coming here to clean up, take

5   your personal stuff and clear out"?

6        A.   No, no.

7        Q.   Did you ever see anybody do that?

8        A.   No, I've never seen anyone -- like I

9   said, people that's living, I don't usually

10  communicate with them or tell them, you know, move

11  on or this and that.  I'm not in the position to do

12  that.

13       Q.   You say usually, but I don't know

14  whether that means ever.

15       A.   I should say never.

16       Q.   That's what we need to know.

17       A.   Never.

18       Q.   Usually means possibly sometimes you

19  did.

20       A.   Never.

21       Q.   You don't recall any instance where you

22  spoke to somebody who appeared to be living on an

23  ODOT or a state site and said, "We're going to

24  clean up, please take your stuff," or something

25  like that?

Page 12

1          A.   No, I never did that.

2          Q.   And do you recall an instance where you

3     were cleaning up and there were no people around

4     but it looked like somebody might be living there,

5     mattresses, a tent?

6          A.   I've seen that, yeah.

7          Q.   Did you go and clean that site?

8          A.   No.

9          Q.   Did you have instructions not to do

10    that or was that your personal choice?

11         A.   There was no instruction to do it or

12    not to do it.  It was just that I never done it.

13         Q.   Let me clarify a little.  You never saw

14    any written instructions one way or the other,

15    correct?

16         A.   Right.

17         Q.   And who was your immediate supervisor

18    back in those years?

19         A.   When you say immediate supervisor, do

20    you mean the Probation Department?  Because we have

21    a supervisor and then when we go to ODOT, they are

22    not necessarily supervisors, but they tell us where

23    to go and what to do.

24         Q.   Let's start with the Probation

25    Department.

Page 13

1        A.   I want to say Dave Browning was the

2    supervisor at the time, I believe.  I'm not sure if

3    it was him.

4        Q.   And you don't recall him telling you

5    anything about homeless sites or homeless people?

6        A.   No.

7        Q.   Anybody at ODOT mention anything about

8    homeless sites or homeless people?

9        A.   No.

10       Q.   Did ODOT people ever tell you anything

11   more than where to clean up?

12       A.   No.  They just -- when we go, like I

13   said, the morning we go to the garage, then we have

14   certain people that we work with from ODOT.  Okay?

15   And they'll say that we're going here and there,

16   we're doing such and such a ramp or such and such a

17   highway.

18       Q.   Okay.  So, their instructions were

19   limited to where and not how?

20       A.   Right.  They just tell us where to go.

21       Q.   During the course of cleanups, would

22   you be -- you had a vehicle with you?

23       A.   Yes.  We have a -- I drove a van.

24       Q.   You drove a van.  That would be for the

25   probationers?

Page 14

1          A.   Right.

2          Q.   And you?

3          A.   Exactly.

4          Q.   Anybody else?  Just you and the

5    probationers?

6          A.   Right.  It's just me and the

7    probationers in the van.

8          Q.   And what about -- let me go back a

9    step.  Were there bags used?

10         A.   Bags as far as --

11         Q.   For putting trash in?

12         A.   Yeah, we have bags.

13         Q.   You carry those with you?

14         A.   We have the bags in the van.

15         Q.   And I take it the probationers would

16   fill up these bags?

17         A.   Yes.

18         Q.   And then who would take the bags?

19         A.   The ODOT crew would come behind us and

20   pick the bags up later because they know, you know,

21   where we're at, and so they'll come behind us and

22   pick the trash bags up.

23         Q.   While the probationers were picking

24   this stuff up and putting it in bags, where would

25   you be?

Page 15

1        A.  I would be in the van.  For example, we
2    have safety lights on the back of the van because,
3    you know, we're like on the side of the highway.
4    The crew would be in front of the van, and I would
5    go along in the van, you know, following them.  You
6    know, I would like use the van to sort of protect
7    them.

8                    They're here and the van is here
9    (indicating) and they'll go along and pick up the
10   trash and I'm just following them in the van.

11        Q.  I see.  Did any probationer in those
12   years, anybody ever come to you and say, "Look, I
13   found something that might be of value, what should
14   I do with it?"  Just what you remember.

15        A.  To be honest with you, no, I don't
16   remember that.

17        Q.  You don't recall that sentence ever
18   being spoken?

19        A.  No.

20        Q.  Or seeing somebody holding up a gold
21   locket and saying, "What should I do with this?"

22        A.  No.

23        Q.  Did you ever talk to the probationers
24   about this possibility?

25        A.  Possibility of?

Page 16

1          Q.   That they might find something that
2    wasn't trash.
3          A.   No, I don't, no, no.  I don't usually
4    say If they find something that's not trash to come
5    bring it to me.
6          Q.   And as far as you know, nothing was
7    ever -- that event never occurred anyway?
8          A.   No.
9          Q.   They never asked you?
10         A.   No.
11         Q.   You never saw, in the place where you
12   were going to clean, you never saw, let's say, a
13   sleeping bag that looked like maybe it belonged to
14   somebody?
15         A.   You know, like I said, I've seen
16   mattresses that's up underneath the underpass.
17   I've seen clothes.  I've seen broken bottles.  I've
18   seen --
19         Q.   Up under --
20              MR. GANULIN:  Objection.  He needs
21   to finish his answer.  You've been cutting him off.
22              THE WITNESS:  I've seen
23   mattresses, broken bottles, clothes, things like
24   that, shoes, you know, but those could be --
25   someone could be living there, someone could be,

Page 17

1    you know.

2    BY MR. FELSON:

3          Q.   Your testimony is you didn't send your

4    people up there?

5          A.   No.   I don't send my people up there

6    because of the safety issue with it being all the

7    way up, slanted.   I didn't want anybody to climb up

8    there and slip and fall and hurt themselves, so I

9    never sent anyone up there.

10          Q.   Now, did you ever talk to other

11    supervisors about how they cleaned up for ODOT?

12          A.   No.

13          Q.   Did the other supervisors clean up --

14    also clean up for ODOT only or did they do some

15    city clean up?

16          A.   We're assigned certain locations each

17    day.   My job primarily was with ODOT, and you have

18    other supervisors that may work with the city, does

19    trash pick up with the city.   My job primarily was

20    with the highway.

21          Q.   Did the Cincinnati police officers ever

22    come around to these sites, say, because there was

23    possibly some danger or for any reason you know?

24          A.   Come to me?

25          Q.   Also show up at the sites to help you

Page 18

1    out in any way?

2            A.   The sites that I've been at, no.  I've

3    never dealt with a police officer that came to me

4    that said this or that, no.

5                      MR. FELSON:  Okay.  That's all I

6    have.

7                      MR. GANULIN:  No questions.

8                      MR. STEVENSON:  Rod, you're done.

9                      (Concluded at 10:35 a.m.)

10                     MR. GANULIN:  I want to discuss

11   this on the record.  About the remaining --

12                     MR. FELSON:  I have a note to

13   myself here, I have a note to myself here to talk

14   to Bob Newman and to see what our position is on

15   the third guy, on Rocky.  I've never laid eyes on

16   him.  Bob has.  Where he is, I don't know.

17                     MR. GANULIN:  Because we have an

18   outstanding request to depose him, and if we can't,

19   then we'll dismiss him.

20                     MR. FELSON:  Whatever you need to

21   do obviously you're going to do.  I will get you an

22   answer on that the best I can soon.

23                     MR. STEVENSON:  Steve, we talked a

24   little bit earlier about Bob Newman's deposition

25   and you and I had a conversation about it.  Perhaps

Page 19

1  we could do that by some way of stipulation, that

2  he went to the property room and looked at the

3  logs.  He didn't look at any property and didn't

4  take anybody with him.

5          MR. FELSON:  This morning before I

6  left, I put a note on the secretary's desk that

7  said pull Bob's affidavit and whatever documents,

8  if there were any, and everything there is put on

9  my desk.  I will look at that so I make sure.  We

10  were just doing it by memory Bob and I yesterday.

11  I do believe you're correct, and Bob said so, too,

12  that he thinks he was alone and so on and he was

13  looking for some way he doesn't have to get up and

14  testify.

15          MR. STEVENSON:  That's fine.

16          MR. FELSON:  We've got to look at

17  it, but the results of what he went and looked at

18  were not ambiguous, as I recall.  He looked, he

19  says he looked for this, that, and the other and

20  didn't find it.  I haven't looked at the affidavit

21  in a year or two.

22          MR. STEVENSON:  All right.

23  Thanks.

24

25          _____

                RODERICK ELLIS

Page 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 21

C E R T I F I C A T E

STATE OF OHIO
                    SS:
COUNTY OF MONTGOMERY


        I, LISA K. KELLER, the undersigned, a
Registered Reporter, Certified and Notary Public
within and for the State of Ohio, do hereby certify
that before the giving of aforesaid deposition said
RODERICK ELLIS, was by me first duly sworn to state
the truth, the whole truth, and nothing but the
truth; that the foregoing is the deposition given
at said time and place by said RODERICK ELLIS; that
said deposition was taken in stenotypy by the court
reporter and transcribed into typewriting under her
supervision; that said transcribed deposition was
submitted to the witness for his examination; the
court reporter was neither a relative of nor
attorney for any of the parties to this case nor
relative of nor employee for any of the counsel;
neither the court reporter nor the affiliated court
reporting firm has a financial interest under a
contract as defined in Civil Rule 28(D).

        IN WITNESS WHEREOF, I hereunto set my
hand and official seal of office this 16th day of
June, 2006.


                    _____
                    LISA K. KELLER
                    Notary Public, State of Ohio
                    My Commission Expires 11-7-08

3ae5be03-23a3-41b4-9d23-db1ce3370ce4

Page 22

1          PLEASE USE THIS ERRATA SHEET TO MAKE ANY
   AND ALL CORRECTIONS, BY LISTING THE PAGE NUMBER,
2  LINE NUMBER AND THEN A BRIEF DESCRIPTION OF THE
   ERROR.  PLEASE DO NOT MAKE ANY MARKS OR CORRECTIONS
3  ON THE TRANSCRIPT.  IF NEEDED USE THE BACK OF THIS
   SHEET.  UPON COMPLETION PLEASE SIGN AND DATE THIS
4  SHEET AT THE BOTTOM.  THANK YOU.

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 SIGNATURE:_____DATE:_____